UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ADVANCED TRAINING GROUP WORLDWIDE, INC., a Nevada Corporation, c/o Obed Law Group, PLC 111 Oronoco Street Alexandria, VA 22314<br><br>                       Plaintiff,<br>v.<br><br>PRO-ACTIVE TECHNOLOGIES, INC., a Virginia Corporation, f/k/a PRO-ACTIVE TECHNOLOGIES, L.L.C., d/b/a PROACTIVE TECHNOLOGIES, LLC, also d/b/a PROACTIVE TECHNOLOGIES L.L.C. 5712 Dot Com Ct Oviedo, FL 32765 SERVE: National Registered Agents, Inc.<br>        4701 Cox Road, Suite 285<br>        Glen Allen, VA 23060<br><br>                       Defendant. | Civil Action No.: 1:19-cv-505<br><br>COMPLAINT AND JURY DEMAND |

**COMPLAINT**

Plaintiff Advanced Training Group Worldwide, Inc. (ATG), by and through undersigned counsel, brings this Complaint against Pro-Active Technologies, Inc. (ProActive), and alleges as follows:

**Background**

1.    In 2012, Advanced Training Group Worldwide, Inc. (ATG) and Pro-Active Technologies, L.L.C. doing business as "ProActive Technologies, LLC" (Pro-Active) signed a joint venture agreement to submit a bid for a government contract – SOF RAPTOR III.

1

2. Under this agreement, the two companies formed a Virginia LLC, Raptor Training Services, LLC (RTS).

3. Raptor Training Services bid for and was awarded the SOF RAPTOR III contract on or about February 13, 2014.

4. Under SOF RAPTOR III, the Government is authorized to spend more than One Hundred Million dollars ($100,000,000) in individual projects or "task orders."

5. From on or about February 3, 2014 to the present, Raptor Training Services has been given multiple task orders under the SOF RAPTOR III contract and has received substantial income and profits.

6. By information and belief, such income and profits, jointly and severally, total in excess of One Hundred Million dollars ($100,000,000).

7. In or around November 2016, Defendants purported to unilaterally terminate Plaintiffs' interest in RTS – acting to preclude them from performing work under SOF RAPTOR III either as a member of RTS or individually.

8. As described below, such action was unlawful and caused substantial harm to Plaintiffs.

## Parties

### A. Plaintiff

9. Plaintiff Advanced Training Group Worldwide, Inc. (ATG), is a Nevada Corporation with principal place of business in Lisbon, Ohio.

10. ATG is recognized by the federal government as a Service-Disabled Veteran-Owned Small Business (SDVOSB).

11. ATG holds an ownership interest and managerial rights in Raptor Training Services, LLC (RTS).

### B. Defendant

12.     Defendant Pro-Active Technologies, Inc. (Pro-Active) is a Virginia corporation doing business as ProActive Technologies, LLC and also doing business as ProActive Technologies, L.L.C. Pro-Active Technologies, Inc. converted from Pro-Active Technologies, L.L.C., in or around 2014, a Virginia Limited Liability Company formed on or around August 12, 1996.

13.     Pro-Active Training Technologies FL, Inc. is the name under which Pro-Active Technologies, Inc. is licensed to do business in the state of Florida.

14.     Pro-Active does business in interstate commerce directly or by affiliation with others in Ohio and Florida.

15.     Pro-Active holds an ownership interest and managerial rights in Raptor Training Services, LLC (RTS).

### Jurisdiction and Venue

16.     Jurisdiction is proper pursuant to 28 U.S.C. §1332. The amount in controversy exceeds $75,000 and is between citizens of different states.

17.     Venue is proper pursuant to 28 USC §1391. A substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of Virginia.

### Statement of Facts

18.     On or about July 5, 2012, the Department of the Army released Solicitation number W900KK12R0022 for "Special Operations Forces Requirements Analysis, Prototyping, Training, Operations and Rehearsal III" (SOF RAPTOR III).

19.     SOF RAPTOR III is the third in a series of contracts – the first two being SOF RAPTOR I and SOF RAPTOR II.

20.     SOF RAPTOR I focused largely on creating training simulators and simulations.

21. SOF RAPTOR II continued this work, but also included "live, virtual, and constructive efforts to meet the training objective and rehearsal objectives of [the United States Special Operations Command] and its component commands." Solicitation W900KK12R0022.

22. SOF RAPTOR III would differ from its predecessors in that it would now "support the objectives of the joint Special Operations Forces (SOF) community to conduct operations." Solicitation W900KK12R0022.

23. It would do so by providing "SOF specific training and rehearsal exercises." Solicitation W900KK12R0022.

24. In short, whereas SOF RAPTORs I and II focused primarily on simulation, SOF RAPTOR III would also provide live-action military training and rehearsal.

25. At the time of the bid, Pro-Active did not independently possess the required skills to bid competitively on SOF RAPTOR III.

26. In addition, government contracting rules applicable to SOF RAPTOR III give preference to small businesses owned by service-disabled veterans as recognized by the Department of Veterans Affairs.

27. At the time of the solicitation and at all times relevant herein, Advanced Training Group Worldwide, Inc. (ATG) was recognized as a service-disabled, veteran-owned small business (SDVOSB).

28. At the time of the solicitation and at all times relevant herein, ATG offered live-action military training and rehearsal to Special Operations Forces and other military and paramilitary groups.

29. At the time of the solicitation and at all times relevant herein, Pro-Active was an engineering company focused on software engineering and support, electrical engineering and test engineering.

30. At the time of the solicitation and at all times relevant herein, Pro-Active did not have experience in nor was it capable of providing live action military training and rehearsal – including the live action training and rehearsals called for by the SOF RAPTOR III solicitation.

31. Pro-Active is not, and was not, at all times relevant to this Complaint, an SDVOSB.

32. If it had not partnered with ATG, Pro-Active would have been unable to secure award of SOF RAPTOR III.

33. On or about July 24, 2012, ATG and Pro-Active Technologies entered into a written Agreement to form a joint venture, Raptor Training Services, LLC (RTS), to bid on the SOF RAPTOR III contract and to then operate the joint venture upon award of the SOF RAPTOR III contract.

34. This Agreement was the operating agreement for Raptor Training Services.

35. In the alternative, this Agreement contains the material terms of the unwritten operating agreement for Raptor Training Services.

36. Under this Agreement, ATG holds a 33% ownership interest in RTS and holds three of six seats on the Board of Directors.

37. Under this Agreement, each member of the Board of Directors holds equal voting rights.

38. Raptor Training Services was duly created, in the State of Virginia, in or around August 2012.

39. Raptor Training Services bid on the SOF RAPTOR III contact and won the contract on or about February 13, 2014.

40. Under the SOF RAPTOR III contract, the federal government puts out requests for proposals to perform specific tasks ("task orders") – such as create a particular computer simulation or provide live-action training and rehearsal.

41. Only companies who have been awarded the contract are eligible to bid on such tasks.

42. Under the Agreement between ATG and Pro-Active, each individual company would bid, through RTS, on SOF RAPTOR III task orders for goods or services that fall within the individual company's relevant area of expertise.

43. Under the Agreement between ATG and Pro-Active, both companies might participate in a given task order, but the company with the most relevant experience will act as the "task order lead" with regard to that task order.

44. The profits earned by each individual company would be the profits earned by computing their individual work share of completed task orders minus agreed upon administrative costs.

45. During the course of the SOF RAPTOR III contract, Pro-Active refused to allow ATG to perform work to which it was entitled under the terms of the Agreement.

46. During the course of the SOF RAPTOR III contract, Pro-Active actively sought to deny work to ATG and to deny ATG the opportunity to bid on work in violation of the Agreement.

47. During the course of the SOF RAPTOR III contract, Pro-Active refused to allow ATG to exercise its managerial rights in RTS.

48. During the course of the SOF RAPTOR III contract, Pro-Active refused to hold Board Meetings.

49. During the course of the SOF RAPTOR III contract, Pro-Active refused to communicate with ATG regarding management decisions and actions of RTS.

50. During the course of the SOF RAPTOR III contract, Pro-Active sought to prevent ATG from communicating with the federal government as a board member of RTS.

51. Under the Agreement, each company also had the ability to engage subcontractors to assist with work to be performed under the contract.

52. During this time, ATG had, under exclusive subcontract, several companies including Xtensfer, Oak Grove Technologies, and F3EA.

53. From 2014 to 2016 multiple task orders and potential task orders under SOF RAPTOR III called for live-action training and rehearsals and/or other tasks within the competency of ATG and/or its exclusive subcontractors.

54. In or around February 2016, Pro-Active and/or those board members of RTS appointed by Pro-Active, began demanding that ATG enter into a new operating agreement to control the rights and responsibilities of the companies as members of RTS.

55. Pro-Active's proposed terms significantly diminished ATG's role in the management of RTS and increased profits for Pro-Active at the expense of ATG.

56. During this time, Pro-Active, and/or board members of RTS appointed by Pro-Active, began contacting ATG subcontractors directly and inviting them to join RTS as members in violation of those subcontractors' existing agreements with ATG.

57. Pro-Active was aware of these existing agreements and encouraged ATG subcontractors – specifically including, but not limited to, Xtenfer, Oak Grove Technologies, and F3EA – to seek to void these agreements.

58. At the time Pro-Active began contacting ATG subcontractors it was aware that there were significant government contracts about to be offered that would be awarded to ATG and its subcontractor.

59. Pro-Active specifically contacted Oak Grove Technologies because it was aware of specific work, which would ultimately be included in Government Task Order #63, which would be awarded to ATG and from which ATG would realize substantial profit due to its exclusive subcontractor arrangement with Oak Grove Technologies.

60. Pro-Active contacted Oak Grove Technologies for the purpose of increasing its own profits on this work by interfering with ATG's contract expectancy with Oak Grove Technologies.

61. Pro-Active specifically contacted Xtenfer because it was aware of a specific work, which would ultimately be included in Government Task Order #110, which would be awarded to ATG and from which ATG would realize substantial profit due to its exclusive subcontractor arrangement with Xtenfer.

62. Pro-Active contacted Xtenfer for the purpose of increasing its own profits on this work by interfering with ATG's contract expectancy with Xtenfer.

63. Pro-Active specifically contacted F3EA because it was aware of specific work, which would ultimately be included in Government Task Order #109, which would be awarded to ATG and from which ATG would realize substantial profit due to its exclusive subcontractor arrangement with F3EA.

64. Pro-Active contacted F3EA for the purpose of increasing its own profits on this work by interfering with ATG's contract expectancy with F3EA.

65. ATG did not consent to these contacts nor Pro-Active's interference with ATG's contractual relationships or its contract expectancy.

66. Advanced Training Group did not consent to Pro-Active's demand to change the rights and responsibilities of the companies as members of RTS.

67. On or about November 8, 2016, Pro-Active sent a letter to Adam Newbold purporting to "terminate" ATG's ownership interest and managerial rights in RTS.

68. Since that time, Pro-Active has refused to recognize ATG's ownership interest in RTS, to allow ATG to participate in the management of RTS, or to exercise its rights to perform work through RTS.

### Count One: Breach of Contract

69. Plaintiff incorporates its previous averments as if fully rewritten herein.

70. On or about July 24, 2012, Pro-Active entered into a valid and enforceable contract (the "Agreement" as referenced above) with ATG governing ownership interest and managerial rights in Raptor Training Services (RTS).

71. In the alternative, upon creation of Raptor Training Services or upon award of the SOF RAPTOR III contract, the Parties entered into an unwritten operating agreement, a contract, governed by the terms set out in the Agreement as supplemented by the Virginia Limited Liability Company Act.

72. On or about November 8, 2016, Pro-Active breached this contract by terminating ATG's ownership interest and managerial rights in RTS.

73. During the course of the contract, Pro-Active further breached this contract by refusing to allow ATG to perform work for the federal government to which it was entitled under the contract.

74. During the course of the contract, Pro-Active further breached this contract by refusing to allow ATG to exercise its managerial rights in RTS.

75. In addition, the Agreement between ATG and Pro-Active contains an implied covenant of good faith and fair dealing.

76. Pro-Active breached this implied covenant of good faith and fair dealing.

77. Pro-Active arbitrarily and unfairly acted to deny ATG work to which it was entitled under the contract.

78. Pro-Active arbitrarily and unfairly terminated ATG's ownership interest and managerial rights in RTS when ATG refused to agree to new contract terms more favorable to Pro-Active.

79. Pro-Active dishonestly failed to hold Board Meetings, failed to inform ATG of Board meetings, and arbitrarily and unfairly denied ATG the exercise of managerial rights in RTS.

80. These breaches, jointly and severally, caused damages to Plaintiffs in excess of Seventy-Five Thousand dollars ($75,000).

## Count Two: Fraud in the Inducement

81. Plaintiff incorporates its previous averments as if fully rewritten herein.

82. In 2012, Pro-Active and/or Robert Acevedo solicited ATG to partner with Pro-Active to bid for the SOF RAPTOR III contract.

83. Without ATG's participation as a verified small business, Pro-Active could not have been awarded the contract.

84. Without ATG's status as a recognized service-disabled, veteran-owned small business, with experience in live-action training and rehearsals and other skills sought under the contract, including specific knowledge of the training needs of Special Operations Forces, Pro-Active would not have been able to win the contract award.

85. To induce ATG to partner with Pro-Active, Pro-Active promised ATG that ATG would perform all work under the federal contract within ATG's sphere of experience and competence.

86. These statements were made by Robert Acevedo in his capacity as the president of Pro-Active.

87. These statements were made during the spring and summer of 2012 via phone calls and emails and in the course of meetings.

88. To induce ATG to partner with Pro-Active, Pro-Active promised ATG that ATG would be an equal partner on the Board of Directors responsible for major decisions of RTS.

89. These statements were made by Robert Acevedo in his capacity as the president of Pro-Active.

90. These statements were made during the spring and summer of 2012 via phone calls and emails and in the course of meetings.

91. To induce ATG to partner with Pro-Active, Pro-Active promised ATG that it would assist ATG in developing and receiving work under the federal contract.

92. These statements were made by Robert Acevedo in his capacity as the president of Pro-Active.

93. These statements were made during the spring and summer of 2012 via phone calls and emails and in the course of meetings.

94. These promises and statements were false and were known to be false at the time they were made.

95. These promises and representations were material to the decision of ATG to partner with Pro-Active to bid on the project.

96. Without these promises and representations, ATG would not have entered into partnership with Pro-Active.

97. ATG and Adam Newbold relied on these promises and representations in deciding to enter into partnership with Pro-Active.

98.     By these representations, Pro-Active gained the ability to bid for and win the SOF RAPTOR III contract.

99.     Immediately after the contract award, Pro-Active began minimizing the involvement and participation of ATG in the management of RTS and in receiving work under the SOF RAPTOR III contract.

100.    Pro-Active did not allow ATG to perform work under the contract within its sphere of experience or competence.

101.    Pro-Active did not inform ATG of RTS Board meetings or allow ATG to participate as an equal partner on the Board.

102.    The intentional, false statements made by Robert Acevedo in his capacity as the president of Pro-Active to induce ATG to enter into partnership with Pro-Active and which induced ATG to enter into partnership with Pro-Active, caused damages to Plaintiffs in excess of Seventy-Five Thousand dollars ($75,000).

### Count Three: Tortious Interference with a Contract - Xtenfer

103.    Plaintiff incorporates its previous averments as if fully rewritten herein.

104.    During the SOF RAPTOR III contract period, ATG had a valid, presently existing contractual relationship with Xtenfer under which ATG stood to gain economic advantage for work performed by Xtenfer.

105.    Defendant Pro-Active was aware of this contractual relationship.

106.    Defendant Pro-Active intentionally interfered with the relationship between ATG and Xtenfer by encouraging Xtenfer to join RTS as a member.

107.    Defendant Pro-Active interfered with this contract for the purpose of creating economic advantage for Pro-Active.

108.   Defendant Pro-Active was aware that this interference was substantially likely to cause economic harm to ATG.

109.   This interference did cause economic harm to ATG.

### Count Four: Tortious Interference with a Contract – Oak Grove Technologies

110.   Plaintiffs incorporate its previous averments as if fully rewritten herein.

111.   During the SOF RAPTOR III contract period, ATG had a valid, presently existing contractual relationship with Oak Grove Technologies under which ATG stood to gain economic advantage for work performed by Oak Grove Technologies.

112.   Defendant Pro-Active was aware of this contractual relationship.

113.   Defendant Pro-Active intentionally interfered with the relationship between ATG and Oak Grove Technologies by encouraging Oak Grove Technologies to join RTS as a member.

114.   Defendant Pro-Active interfered with this contract for the purpose of creating economic advantage for Pro-Active.

115.   Defendant Pro-Active was aware that this interference was substantially likely to cause economic harm to ATG.

116.   This interference did cause economic harm to ATG.

### Count Four: Tortious Interference with a Contract – F3EA

117.   Plaintiffs incorporate its previous averments as if fully rewritten herein.

118.   During the SOF RAPTOR III contract period, ATG had a valid, presently existing contractual relationship with F3EA under which ATG stood to gain economic advantage for work performed by F3EA.

119.   Defendant Pro-Active was aware of this contractual relationship.

120.    Defendant Pro-Active intentionally interfered with the relationship between ATG and F3EA by encouraging F3EA to join RTS as a member.

121.    Defendant Pro-Active interfered with this contract for the purpose of creating economic advantage for Pro-Active.

122.    Defendant Pro-Active was aware that this interference was substantially likely to cause economic harm to ATG.

123.    This interference did cause economic harm to ATG.

### Count Five: Interference with Contract Expectancy

124.    Plaintiffs incorporate its previous averments as if fully rewritten herein.

125.    With regard to each of the subcontractors Xtenfer, Oak Grove Technologies, and F3EA, there was a specific prospective business relationship and/or contract by which ATG was reasonably certain to realize substantial profits.

126.    Defendant Pro-Active was aware of these prospective business relationships and/or contracts.

127.    Defendant Pro-Active specifically interfered with these prospective business relationships and intentionally sought to interfere with and deny to Plaintiff these business relationships and/or contract.

128.    Defendant Pro-Active interfered with these prospective business relationships and/or contract for the purpose of increasing its own profits.

129.    Defendant Pro-Active's interference with these prospective business relationships and/or contract was improper because, among other actions Defendant Pro-Active encourages each of the subcontractors to breach and/or otherwise terminate existing contractual relationships with Plaintiff.

130.    Defendant Pro-Active's intentional misconduct was the proximate cause of the loss of Plaintiff's business expectancy with regard to each of the three subcontractors.

131.    Defendant Pro-Active's intentional misconduct caused damage to Plaintiff in excess of $75,000.

### Count Six: Unjust Enrichment

132.    Plaintiffs incorporate its previous averments as if fully rewritten herein.

133.    Plaintiff conferred a benefit on Pro-Active by participating in the creation of RTS and its bid on the SOF RAPTOR III contract by which Pro-Active received substantial profits;

134.    Pro-Active knew that the ATG was conferring the benefit;

135.    Defendant Pro-Active has continued to receive substantial profits, and substantially increased profits, since terminating Plaintiffs participation in RTS and the SOF RAPTOR III contract.

136.    Defendant Pro-Active accepted or retained the benefit under circumstances which would make it inequitable for the defendant to retain the benefit without paying for its value,

### Jury Demand

Pursuant to Fed. R. Civ. P. 38 or any similar rule of law, Plaintiff demands a trial by jury for all causes of action and issues for which trial by jury is available.

**WHEREFORE**, Plaintiffs pray that the Court shall grant:

1) Judgment in favor of Plaintiff on the above-listed counts;

2) For an award of damages, including punitive damages, direct and consequential damages, in an amount to be proven at trial;

3) For an award of costs in this action;

4) For any and all such other relief as the Court may deem just and proper.

DATED: April 24, 2019.

        ADVANDED TRAINING GROUP WORLDWIDE, INC., Plaintiff, *By and Through Counsel:*

        OBED LAW GROUP, PLC

By:     /s/Seth Obed
    SETH JAMES B. OBED (VSB # 82482)
    111 Oronoco Street
    Alexandria, VA 22314
    [T] (703) 638-8913; [F] (703) 894-4940
    sobed@obedlaw.com

    P.M. DUBBELING, PLLC

By:     /s/
    PAUL M. DUBBELING, *Pro Hac Vice Pending*
    210 North Columbia Street
    Chapel Hill, NC 27514
    [T](919)635-6005; [F](919)404-7074
    Paul.dubbeling@pmdubbeling.com

    WHITCOMB, SELINSKY, MCAULIFFE, PC

By:     /s/
    JOSEPH A. WHITCOMB, *Pro Hac Vice Pending*
    2000 S. Colorado Blvd. Tower One, Suite 9500
    Denver, CO 80222
    [T](303)534-1958; [F] (303)534-1949
    joe@whitcomblawpc.com

    EFFECTUS PLLC

By:     /s/
    LEE DOUGHERTY, *Pro Hac Vice Pending*
    1101 Connecticut Avenue, NW; Suite 450
    Washington, DC 20036
    Telephone: (202)888-2104
    LDougherty@Effectus.legal

    *Attorneys for Plaintiff*