## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| **ADVANCED TRAINING GROUP** | ) | |
| **WORLDWIDE, INC.,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 19-cv-505** |
| | ) | |
| **PROACTIVE TECHNOLOGIES INC.,** | ) | |
| **Defendant.** | ) | |

### <u>MEMORANDUM OPINION</u>

At issue in this dispute between two former joint venture partners are the parties' cross-motions for summary judgment. In essence, plaintiff and defendant entered into a Memorandum of Understanding ("MOU") to form a Virginia limited liability company, Raptor Training Services, LLC ("RTS" or the "JV"), in order to bid on a multi-million-dollar indefinite duration, indefinite quantity ("IDIQ") government contract with the United States Army. Although the parties formed a JV, won the government contract, and began executing task orders under the government contract, they never reached agreement on a written operating agreement for the JV. In the end, defendant, ProActive Technologies, Inc. ("ProActive"), terminated plaintiff, Advanced Training Group Worldwide, Inc. ("ATG"), from the JV. ATG now sues ProActive, alleging six claims: Breach of Contract (Count I); Tortious Interference with Contract (Counts II-IV); Interference with Contract Expectancy (Count V); and Unjust Enrichment (Count VI).

For the reasons that follow, plaintiff's motion for partial summary judgment on Count I is denied, and defendant's motion for summary judgment on all claims is granted in part and denied in part. Specifically, defendant's motion for summary judgment with respect to Counts I is denied, but defendant's motion is granted with respect to Counts II-VI. Accordingly, summary judgment

1

must be entered in favor of defendant on all claims except plaintiff's breach of contract claim in Count I.

## I.

The entry of summary judgment is appropriate only where there are no genuine disputes of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Thus, it is important to identify the record facts as to which no genuine dispute exists. In this regard, Local Rule 56(B) directs a movant for summary judgment to include in its submission a separately captioned section listing in numbered-paragraph form all material facts as to which the movant contends no genuine dispute exists; the nonmovant must then respond to each paragraph citing admissible record evidence to establish a genuine dispute of material fact. In this case, both parties have substantially complied with the Local Rule. Accordingly, the facts recited herein are derived from the parties' lists of material facts in their respective motions for summary judgment.

1. Defendant ProActive was a Virginia limited liability company until 2014, when it converted to a Virginia corporation. ProActive provides services in the military simulation and training system marketplace.

2. Plaintiff ATG is an Ohio corporation. ATG provides advanced tactical training services for the military.

3. On November 21, 2011, Robert Acevedo, CEO of ProActive, contacted Adam Newbold, CEO and President of ATG, regarding the possibility of ATG and ProActive exploring mutual business opportunities.

4. Prior to the formation of the RTS JV, ATG had never bid on or performed a federal government contract.

5. On June 8, 2012, Acevedo sent Newbold a draft Memorandum of Understanding ("Draft MOU") to review. The stated purpose of the Draft MOU was to form a joint venture between ATG and ProActive to bid on and perform the Special Operations Forces RAPTOR III IDIQ contract with the United States Army (the "SOF RAPTOR III Contract"). The Draft MOU set forth that membership interests and voting rights in the JV would be apportioned 67% to ProActive and 33% to ATG. The Draft MOU also proposed a six-member Board of Directors, with three proposed members each from ProActive and ATG.

6. On June 8, 2012, Newbold sent the Draft MOU to ATG officer Justin Cestaro for his review. In response Cestaro wrote: "The 63/33 [sic] split does not reflect profit percentage but ownership/voting a[s] I read it."[1]

7. On June 25, 2012, Newbold emailed Acevedo regarding the Draft MOU and stated, "Regarding RAPTOR: The MOU looks ok. It's been pointed out frequently how you'll basically have control to cut us out or do whatever you wish. I'm actually okay with that. As far as I'm concerned, we are riding your coat tails on this one." Acevedo responded to Newbold and stated: "As for RAPTOR—yes ProActive would control the organization." Newbold then responded: "Thanks Bob. That is how I understand and agree to work things."[2]

8. On July 27, 2012, ProActive and ATG executed the MOU for the RTS JV.[3] The MOU includes the following material provisions:

   a. Section 1.0: "The goals of the JV are to secure the single award under the SOF RAPTOR III IDIQ; bid on task orders offered under the SOF RAPTOR III IDIQ award, and to perform the services required to support successful execution of awarded task orders in accordance with the terms and conditions governing the JV as outlined herein."[4]

   b. Section 5.0: "Initial membership in the L.L.C. will consist of the Members identified in Section 1.0, with membership interests and voting rights apportioned among the Members according to the following schedule:
      i. ProActive: 67%
      ii. ATG: 33%"

   c. Section 7.0: ATG and ProActive each designated three members of a six-member Board of Directors for the JV. The MOU states: "The JV Board is responsible for oversight management of the JV."

   d. Section 12: This Section outlines the framework for allocating Task Orders under the SOF RAPTOR III Contract.[5]

---

[1] Email Communications between director@atgworldwide.us and cso@atgworlwide.us, Dkt. 73-2, at 2.

[2] Email Communications between Adam Newbold and Bob Acevedo, Dkt. 75-4, at 2-3.

[3] Memorandum of Understanding between ATG and ProActive, Dkt. 136-1.

[4] ATG disputes this fact but does not provide any basis for the dispute. The asserted fact is a direct quote from the MOU executed by the parties, and accordingly, it is undisputed.

[5] ATG disputes ProActive's formulation of this fact, which stated that Section 12.5 does not provide any obligation to award any specific workshare of task orders to ATG. In support of this dispute, ATG cites to Section 12.5.2, which states that ATG and ProActive possess different areas of expertise, and each JV member would lead task orders within their area of expertise. Section 12.5.2 has been added to the statement of undisputed material facts to

i. Section 12.5.2: "It is understood that the primary strength of the JV is that the Members possess generally exclusive areas of expertise and are recognized within the simulation industry as successful competitors in those areas. In order to most effectively leverage these primary strengths, the Task Order Lead will be in most instances the Member whose recognized expertise encompasses the majority of the primary and vital requirements of the task order."

ii. Section 12.5.5.1: "Task orders awarded under the JV will be allocated to the Members in accordance with the work share and functional structure described in the task order proposal."

e. Section 13.0: This Section outlines a dispute resolution process for the JV. In part, it states: "Any dispute that cannot be resolved to the disputing parties' mutual satisfaction, after good faith negotiations, within ninety (90) calendar days from the date the written claim is received by the other party or by the JV Board, or such additional time as such parties agree upon in writing, may be settled by appropriate legal proceedings including, without limitation, binding arbitration under the Comprehensive Arbitration rules of JAMS, such arbitration to be held in Fairfax County, Virginia."

f. Section 20.0: This Section provides that a JV Member can be terminated from the JV for its breach of the MOU, but does not specify the process by which the JV Member can be terminated. Specifically, Section 20.0 states in relevant part that: "If a Member…is terminated from the JV for its breach of this MOU or the JV governing documents, the remaining Member(s) will be entitled to purchase the terminating Member's interest in the L.L.C. on a basis proportional to their membership interests, for a total price of $1,000."

g. Section 24.0: This Section provides that: "This MOU and all negotiations and any legal agreements prepared in connection with the JV will be governed by and construed in accordance with the laws of the Commonwealth of Virginia."

9. On July 30, 2012, three days after the execution of the MOU, Newbold sent an email to his ATG employees that explained ATG's role in the pursuit of the SOF RAPTOR III Contract and stated: "There is plenty of risk that once the contract is awarded, ProActive could decide they want to use someone else to fulfil the

---

address ATG's dispute with ProActive's characterization of Section 12.5 of the MOU. Nonetheless, the MOU does not guarantee any specific share of work to either JV member.

tactical requirements."[6]

10. On August 9, 2012, ProActive and ATG formed RTS, a Virginia limited liability company. The Articles of Organization for RTS contain no substantive provisions related to the governance or operation of the RTS LLC.

11. Although the MOU contemplates the execution of a JV operating agreement upon the award of the SOF RAPTOR III Contract to RTS, the parties never executed a formal written operating agreement for the JV.

12. On February 13, 2014, the U.S. Government awarded the SOF RAPTOR III Contract to RTS, and RTS accepted the contract award.

13. The SOF RAPTOR III Contract incorporates FAR clause § 52.219-14 Limitations on Subcontracting (Nov. 2011) (50% Rule). The applicable portion of the 50% Rules states: "At least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern." The "concern" in this instance is RTS through its constituent members.

14. The U.S. Government never modified or removed the Limitations on Subcontracting clause contained in the SOF RAPTOR III Contract.

15. On January 2, 2013, the National Defense Authorization Act for Fiscal Year 2013 ("FY2013 NDAA") was signed into law. *See* Pub. L. No. 112-239, 126 Stat. 1632. Section 1651 of the FY2013 NDAA directed that the limitations on subcontracting clause be changed such that subcontracts between a small business concern and a similar situated entity no longer counted as subcontracts for the purpose of the 50% Rule.[7] In other words, all work completed by employees of small businesses would count toward the 50% Rule, not only the work performed by the small business that is the party to the government contract.

---

[6] Email Communications between Adam Newbold and Bob Acevedo, Dkt. 75-6, at 3.

[7] Specifically, § 1651 of the FY2013 NDAA amended the limitations on subcontracting provision as follows:

(a) IN GENERAL.—If awarded a contract under section 8(a), 8(m), 15(a), 31, or 36, a covered small business concern—

(1) in the case of a contract for services, may not expend on subcontractors more than 50 percent of the amount paid to the concern under the contract;…

(b) SIMILARLY SITUATED ENTITIES.—Contract amounts expended by a covered small business concern on a subcontractor that is a similarly situated entity shall not be considered subcontracted for purposes of determining whether the covered small business concern has violated a requirement established under subsection (a) or (d).

FY2013 NDAA, Pub. L. No. 112-239, 126 Stat. 2079-80.

16. The FY2013 NDAA's amendment to the limitations on subcontracting clause was not self-executing because Congress directed that the amendment be implemented through the public rule-making process.

17. On October 6, 2015, Dick Stockton, COO of ProActive and CEO of RTS, emailed Newbold to inform him that Ted Mundelein, an employee of ProActive, had met with a government representative the day before and that the government representative informed Mundelein that RTS would be receiving a letter that "shows concern" about RTS meeting the requirements of the 50% Rule.[8]

18. On December 3, 2015, ProActive contacted an SBA consultant, Nick Owens, to find out whether the amendment to the 50% Rule was self-executing.

19. On December 11, 2015, Stockton emailed Newbold, Acevedo, and Mundelein and informed them that Owens advised that the amendments to the 2013FY NDAA were not self-executing. Stockton then stated that if the government sent a letter asking RTS to show compliance with the 50% Rule, RTS would have to show that it is not close to the 50% requirement. Stockton stated that RTS had performed approximately 10% of the work under the current version of the 50% Rule, but 90% of the work performed to date would count toward the new version of the 50% Rule, when and if implemented. Because of RTS's non-compliance with the 50% Rule as of December 2015, Stockton suggested bringing another small business into the JV in a non-voting capacity to bring RTS into compliance with the 50% Rule.

20. On January 7, 2016, the U.S. Government contracting office emailed ProActive regarding the application of the 50% Rule. The government contracting officer stated: "We have talked with both the PEO STRI Deputy for Small Business Programs and our lawyer regarding the information you provided on 'similarly situated entities'. Based on the guidance provided by our lawyer, the current regulations apply until the statute is properly implemented by SBA, their rules are changed, and the FAR/DFAR Councils implement into the acquisition regulations….Based on Task Orders issued to date, you are not currently meeting the intent of FAR Clause 52.219-14. Under CPARS you are evaluated annually and this will be annotated. Compliance with 52.914.14 on a Single Award IDIQ is usually determined at the end of the contract. Given that we are only two years into a five year contract, it is likely the new rule would be in place prior to contract end and there would not be any issues (assuming 50% is being done by the prime and/or small business contractors)."[9]

---

[8] ATG disputes ProActive's asserted fact that the U.S. Government informed RTS that RTS would be receiving a "shows concern" letter. This fact has been modified to conform to the evidence in the summary judgment record. Namely, the only evidence of this October 2015 communication between RTS and the U.S. Government is an email from Dick Stockton to Adam Newbold describing a meeting between Ted Mundelein and a government representative. As modified, there is no genuine dispute of any material fact.

[9] Email Communications between Kathy Keyser, Director of Contracts at RTS, and Sherry Alexander, Contract

21. In March 2016, ProActive initiated negotiations with ATG to enter into a formal JV operating agreement that would add subcontractors to the JV as Class B Members. Stockton claims that these operating agreement negotiations started in an attempt to remedy RTS's noncompliance with the 50% Rule. ATG claims that ProActive initiated these JV operating agreement negotiations to increase ProActive's profit share in RTS.

22. ProActive and ATG were unable to reach an agreement on a formal JV operating agreement because of a number of disputes between the parties. Two such disputes were:[10]

    a. ATG took the position that because ProActive and ATG had an equal number of seats on the RTS Board of Directors (three each), ATG was entitled to 50% voting rights and equal decision-making authority. In contrast, ProActive took the position that to the extent the RTS Board of Directors had any authority, board members voted in accordance with the MOU's stated division of voting interests, namely 67% ProActive and 33% ATG.

    b. ATG believed that the addition of Class B Members was not necessary for compliance with the 50% Rule. In contrast, ProActive believed it was essential to add subcontractors to RTS as Class B Members to comply with the 50% Rule.

23. On October 28, 2016, Stockton emailed Michael Ecker, Chief Strategy Officer (CSO) of ATG, and explained Stockton's position that ProActive was entitled to 67% voting rights and profit sharing in RTS. The next day, Ecker forwarded Stockton's email to Newbold and stated: "The MOU that I have (attached) states exactly as [Stockton] writes below – it makes it out that while we both have 3 [Board] members, voting is 67/33. So, in effect, his argument is valid. Thoughts?"[11]

---

Specialist at U.S. Army Contracting Command, Dkt. 75-14, at 3-4.

[10] ATG disputes the facts asserted in ¶¶ 34-38 of ProActive's brief in support of its motion for summary judgment by arguing that there were a number of additional disputes between the parties that prevented the execution of a JV operating agreement. The additional changes in the proposed JV operating agreement that ATG disagreed with include: (i) ProActive's unilateral right to add Class A and Class B Members to the JV; (ii) ProActive's exclusive right, as the Managing Member, to bid and assign task orders to Class A Members; and (iii) the mandatory arbitration language for dispute resolution. Although it is clear that ATG and ProActive disagreed on these issues, the summary judgment record makes abundantly clear that the two primary disputes between the parties are the disputes described above in Material Fact 22(a) and 22(b).

[11] Email Communications between Michael Ecker and Adam Newbold, Dkt. 73-12, at 1.

ATG attempts to dispute this fact by arguing that Ecker testified to a different view of the MOU voting in his deposition in this case. Although Ecker claims in his November 26, 2019 deposition that he thought the voting rights were 50/50 based on the six Board seats, that does not dispute that Ecker actually sent this email to Newbold in

24. On November 1, 2016, ProActive sent ATG a "Notice of Termination" letter. In that letter, ProActive claims it is terminating ATG from the JV for a material breach of the MOU, namely that ATG insisted that the JV operating agreement being negotiated apportion membership interests and voting rights 50-50. The letter provides ATG until November 4, 2016 to complete the JV operating agreement, allegedly so that the JV can add Class B members and continue to perform under the SOF RAPTOR III Contract.[12]

25. On November 3, 2016, ATG responded to ProActive's Notice of Termination letter. The response letter states that ATG is willing to continue negotiations on a JV operating agreement but disputes that such an agreement is urgent because the parties have been operating under the MOU for over two years. The letter further asserts that the MOU establishes the Board of Directors as the governing entity for the JV and that the Board of Directors has six members, three from ATG and three from ProActive.[13]

26. On November 8, 2016, ProActive sent ATG a letter titled "Termination of ATG for material breach of Memorandum of Understanding." The letter states that ProActive is terminating ATG from the RTS JV because of ATG's "prolonged refusal to operate in accordance with the MOU, including without limitation, its repeated demand for a fifty-fifty share of voting rights and membership interests in [RTS] in contravention of the MOU."[14] The letter also reiterates that ATG has refused to execute an operating agreement that adds Class B Members to the JV.[15]

27. On November 22, 2016, ProActive notified the government that it had the authority to remove ATG from the JV based on ProActive's 67% membership interest and voting rights in RTS.

---

October 2016. Accordingly, plaintiff has not effectively disputed defendant's asserted fact, and there is no genuine dispute of material fact with respect to this fact.

[12] ATG disputes ProActive's version of this material fact, which claims that RTS faced an imminent deadline from the government to solve the 50% Rule issue. Because there is no evidence in the summary judgment record that the government imposed an imminent deadline on RTS to comply with the 50% Rule during the fall of 2016, that assertion has been removed. Accordingly, the above description of ProActive's "Notice of Termination" letter to ATG removes any dispute as to any material fact.

[13] ATG disputes ProActive's version of this material fact, which asserts that ATG would never agree to ProActive's proposed terms. The above formulation of ProActive's asserted fact more accurately captures the contents of ATG's response.

[14] November 8, 2016 Termination Letter, Dkt. 75-23, at 2.

[15] ATG disputes ProActive's version of this material fact, which asserts that ProActive exercised its 67% membership voting rights and terminated ATG from RTS for breach of the MOU in accordance with Section 20.0 of the MOU. The above formulation of ProActive's asserted fact more accurately captures the contents of the termination letter that ProActive sent to ATG. Accordingly, the above description of ProActive's letter removes any dispute as to any material fact.

28. On December 22, 2016, ProActive, Oak Grove Technologies, LLC ("Oak Grove"), and F3EA, Inc. ("F3EA") executed a document titled "Operating Agreement of Raptor Training Services, L.L.C." The document lists ProActive as the sole Class A Member of RTS and lists Oak Grove and F3EA as Class B Members of RTS.

**Undisputed Material Facts Related to Counts II-V (Tortious Interference)**

29. On January 13, 2015, Oak Grove Technologies, LLC ("Oak Grove") and ATG entered into a Master Subcontract Agreement (the "OG MSA"), which was subsequently amended and renewed on June 16, 2016. Oak Grove did not believe that the MSA prevented Oak Grove from performing work as a subcontractor for RTS or for ProActive.

30. On March 20, 2015, F3EA, Inc. ("F3EA") and ATG entered into a Master Subcontract Agreement (the "F3EA MSA"). F3EA did not believe that the MSA prevented F3EA from performing work as a subcontractor for RTS or for ProActive. On May 26, 2016, ATG provided F3EA with the opportunity to work as an exclusive affiliate of ATG, and F3EA declined to become an affiliate of ATG.

31. On December 1, 2015, Xtenfer Consulting, Inc. ("Xtenfer") and ATG entered into a Master Subcontract Agreement (the "Xtenfer MSA"). Xtenfer never performed any work for ATG under the Xtenfer MSA. On April 27, 2016, ATG provided Xtenfer with a draft exclusive affiliate agreement. On May 6, 2016, Xtenfer declined to enter into an exclusive affiliate agreement with ATG.

## II.

On December 30, 2019, defendant filed a motion for summary judgment on all of plaintiff's claims. That same day, plaintiff filed a cross-motion for partial summary judgment with respect to two issues relevant to plaintiff's breach of contract claim (Count I). Specifically, plaintiff's motion for partial summary judgment requests two findings: (i) that the MOU termination provision does not provide ProActive the unilateral right to dissociate ATG from the JV and (ii) that ATG never materially breached the JV's MOU.

The standard for summary judgment is too well-settled to require extensive discussion here. Simply put, summary judgment is appropriate when there is "no genuine issue as to any material fact" and based on those undisputed facts the moving party "is entitled to judgment as a matter of

law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To serve as a bar to summary judgment, facts must be "material," which means that the disputed fact "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the parties have made cross-motions for summary judgment, each motion must be considered on its own merits to determine whether either of the parties deserves judgment as a matter of law. *See Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). The fact that both sides moved for summary judgment "neither establish[es] the propriety of deciding a case on summary judgment, nor establish[es] that there is no issue of fact requiring that summary judgment be granted to one side or another." *Continental Air., Inc. v. United Air., Inc.*, 277 F.3d 499, 511 n.7 (4th Cir. 2002) (citations and quotation marks omitted).

## III.

Defendant has moved for summary judgment on plaintiff's tortious interference claims, Counts II-V. In this respect, Counts II-IV of the Amended Complaint allege that ProActive interfered with ATG's contracts with Oak Grove, F3EA, and Xtenfer (collectively, the "Third-Party Entities") by encouraging those entities to become Class B Members of the JV. Count V of the Amended Complaint alleges that ProActive interfered with ATG's business expectancy in receiving future task orders by encouraging the Third-Party Entities to breach or terminate their existing contractual relationships with ATG. Because the Third-Party Entities never breached or terminated their respective contracts with ATG and because ProActive did not use improper means or methods to interfere with ATG's business expectancy, summary judgment must be entered in favor of defendant and against plaintiff on Counts II-V.

The Supreme Court of Virginia has made clear that "tortious interference with contract and tortious interference with business expectancy are intentional torts predicated on the *common law*

10

*duty to refrain from interfering with another's contractual and business relationships.*" *Francis Hosp., Inc. v. Read Properties, LLC*, 296 Va. 358, 363–64 (2018) (emphasis added in *Francis*) (quoting *Dunlap v. Cottman Transmission Sys.*, 287 Va. 207, 218 (2014)). Under Virginia law, the elements required to establish a *prima facie* case of tortious interference with contract are:

> (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Chaves v. Johnson*, 230 Va. 112, 120 (1985) (citing *Calbom v. Knudtzon*, 65 Wash.2d 157, 162-63 (1964)). To establish a *prima facie* case of tortious interference with business expectancy, in addition to establishing the same four elements as a claim for tortious interference with contract, a plaintiff is required to show that the defendant "used improper means or methods to interfere with the [business] expectancy." *Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 284 Va. 382, 404 (2012).

Here, ATG's tortious interference claims fail because the summary judgment record establishes that ProActive did not induce the Third-Party Entities to breach or terminate ATG's contracts with them. Simply put, the Master Subcontract Agreements ("MSAs") between ATG and the Third-Party Entities do not contain any provision that prohibits the Third-Party Entities from becoming members of the JV or from entering subcontracts with the JV or with ProActive.

Seeking to avoid this conclusion, ATG argues that Article 18, Section 8 of the MSAs prevents the Third-Party Entities from interfering with ATG's contractual relationships and that ProActive's discussions with the Third-Party Entities about joining the JV as Class B Members interfered with ATG's contractual relationship with ProActive and the JV. ATG's argument plainly fails. Article 18, Section 8 of the MSAs states in relevant part that:

> [The Third-Party Entity] covenants that for the term of this Subcontract and/or any

11

Task Order(s) issued thereunder, it shall not improperly interfere with any of [ATG's] contractual relationships including those with the U.S. Government…[The Third-Party Entity] agrees that any material violation of this Article shall entitle [ATG] to terminate this Subcontract for default.[16]

The Third-Party Entities did not "improperly interfere" with any of ATG's contractual relationships, including ATG's relationship with ProActive in the JV. It is undisputed that ATG and ProActive were considering the addition of Class B Members to the RTS JV. The summary judgment record establishes that ATG and ProActive discussed adding Class B Members to the JV for eight months before those discussions ultimately fell apart. During this same time period, ATG offered several Third-Party Entities the opportunity to become exclusive affiliates of ATG. The Third-Party Entities turned down ATG's exclusive affiliate offers, and two of the Third-Party Entities ultimately joined the JV as Class B Members after ProActive terminated ATG from the JV.[17] These business decisions made by the Third-Party Entities in no way improperly interfered with ATG's contractual relationship with ProActive and the RTS JV. Accordingly, ATG has failed to establish the third element required for its tortious interference claims, namely that ProActive induced the Third-Party Entities to breach their contracts with ATG. Simply put, the Third-Party Entities did not breach their MSAs with ATG, and therefore judgment must be entered in favor of defendant and against plaintiff on Counts II-IV.

With respect to Count V, tortious interference with business expectancy, ATG's claim fails because the summary judgment record contains no evidence that ProActive used improper means or methods to interfere with ATG's expectancy in future task order awards to the MSAs via the JV. In this respect, the Supreme Court of Virginia has made clear the type of conduct that

---

[16] *See, e.g.*, Master Subcontract Agreement between ATG and Oak Grove, Article 18, Section 8, Dkt. 136-11, at 16.

[17] No opinion is expressed here as to whether ProActive's termination of ATG from the JV was proper under the terms of the MOU.

constitutes improper means or methods:

> Improper methods or means generally involve violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, breach of a fiduciary relationship, violation of an established standard of a trade or profession, unethical conduct, sharp dealing, overreaching, or unfair competition.

*Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 284 Va. 382, 404 (2012). There is no evidence in the summary judgment record that ProActive committed any of these acts. As noted, ATG and ProActive discussed adding Class B Members to the JV for eight months before those discussions ultimately fell apart. ATG was fully aware that the Third-Party Entities were the candidates being considered for Class B membership in the JV. None of this conduct amounts to the improper means or methods required to establish a claim of tortious interference with business expectancy. Accordingly, judgment must be entered in favor of defendants and against plaintiff on Count V.

In sum, the undisputed summary judgment record makes clear that the Third-Party Entities never breached or terminated their respective contracts with ATG and that ProActive did not use improper means or methods to interfere with ATG's business expectancy in future task orders.[18] Accordingly, summary judgment must be entered in favor of defendant and against plaintiffs on

---

[18] Although ATG argues that ProActive's actions induced the Third-Party Entities to breach the MSAs between the Third-Party Entities and ATG, the essence of ATG's argument is that ProActive's actions induced the Third-Party Entities to interfere with ATG's relationship with ProActive and the JV. The purpose of the MSAs makes this conclusion abundantly clear—each MSA exclusively covered work awarded under the SOF RAPTOR III Contract, a contract that was awarded to the JV, not ATG. Thus, even though ATG's tortious interference claims nominally allege interference with the MSAs, these claims substantively allege tortious interference with ATG's JV relationship and with the award of government task orders via the JV. In this respect, Virginia law is unmistakably clear that tortious interference claims cannot be brought against ProActive because such claims can "only lie[] against those outside of the contractual relationship, i.e., strangers to the contract or business expectancy." *Francis Hosp. Inc. v. Read Props., LLC*, 296 Va. 358, 365 (2018). ProActive is unquestionably a party to the JV and to the SOF RAPTOR III Contract through its membership in the JV. Accordingly, even assuming, *arguendo*, that the Third-Party Entities breached their MSAs with ATG (which they did not on this record), ATG's tortious interference claims fail as a matter of law because those claims cannot be brought against ProActive because ProActive is a party to the contract or expectancy. *See L-3 Commc'ns Corp. v. Serco, Inc.*, 926 F.3d 85, 92 (4th Cir. 2019) (holding that plaintiffs' tortious interference claims against defendant fail as a matter of law because defendant was a party to the contract or expectancy as the prime contractor responsible for issuing the task orders in which plaintiffs alleged to have a business expectancy); *Fox v. Deese*, 234 Va. 412, 427 (1987) ("A person cannot intentionally interfere with his own contract.").

Counts II-V.

## IV.

Defendant has also moved for summary judgment on plaintiff's unjust enrichment claim, Count VI. In this respect, Count VI of the Amended Complaint alleges that ATG conferred a benefit on ProActive through ATG's participation in the creation of RTS and the award of the SOF RAPTOR III Contract to RTS and that ProActive has continued to receive substantial profits based on the benefits conferred to ProActive by ATG. Because the existence of an express contract covering the same subject matter precludes a claim for unjust enrichment, summary judgment must be entered in favor of defendant and against plaintiff on Count VI.

Unjust enrichment is an implied contract action based on the principle that "one person…may not enrich himself unjustly at the expense of another." *Rinehart v. Pirkey*, 126 Va. 346, 351 (1919) (internal quotation marks and citation omitted). The Supreme Court of Virginia has made unmistakably clear that "the existence of an express contract covering the same subject matter of the parties' dispute precludes a claim for unjust enrichment." *CGI Fed. Inc. v. FCi Fed., Inc.*, 295 Va. 506, 519 (2018); *see also Southern Biscuit Co. v. Lloyd*, 174 Va. 299, 311 (1940) ("[A]n express contract defining the rights of the parties necessarily precludes the existence of an implied contract of a different nature containing the same subject matter."). Where an express contract exists between the parties, whether the contract bars an unjust enrichment claim is a question of law. *See CGI*, 295 Va. at 519.

Here, ATG elected to sue for contract damages pursuant to an alleged breach of the MOU "and as a consequence, affirmed the contract and consented to be bound by its provisions." *Id.* at 520 (quoting *Ewing v. Dutrow*, 128 Va. 416, 424 (1920) (internal quotation marks omitted).

ProActive does not dispute that the MOU served as the de facto operating agreement for the JV.[19] Moreover, Section 20.0 of the MOU addresses termination and voluntary withdrawal from the JV. Thus, an express contract between the parties exists that covers the same subject matter as the dispute in plaintiff's unjust enrichment claim. Where, as here, neither party challenges the validity of the express agreement, the express agreement bars plaintiff's unjust enrichment claim. *See McPike v. Zero-Gravity Holdings, Inc.*, 280 F. Supp. 3d 800, 810 (E.D. Va. 2017). Accordingly, summary judgment must be entered in favor of defendant on Count VI of the Amended Complaint.

## V.

Finally, the parties have filed cross-motions for summary judgment with respect to plaintiff's breach of contract claim (Count I). On this record, neither party is entitled to judgment as a matter of law on Count I. Accordingly, plaintiff's motion for partial summary judgment on Count I is denied, and defendant's motion for summary judgment with respect to Count I is also denied.

## VI.

For the reasons set forth above, judgment on Counts II-VI will be entered in favor of defendant and against plaintiff. The parties' cross-motions for summary judgment are denied in all other respects.

An appropriate order will issue separately.

The Clerk is directed to provide a copy of this Opinion to all counsel of record.

Alexandria, Virginia
April 17, 2020

T. S. Ellis, III
United States District Judge

---

[19] The parties dispute the meaning of certain provisions of the MOU and whether one or the other party breached the terms of the MOU, but neither party disputes that the MOU was the de facto operating agreement of the JV.