IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| ADVANCED TRAINING GROUP WORLDWIDE, INC., | ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Case No. 1:19-cv-505 (PTG/WEF) |
| PROACTIVE TECHNOLOGIES, INC., | ) ) ) | |
| *Defendant.* | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

This breach of contract case arises out of a dispute between Plaintiff Advanced Training Group Worldwide, Inc. ("ATG") and Defendant ProActive Technologies, Inc. ("ProActive"). The parties were once part of a joint venture, from which ProActive terminated ATG, citing a material breach of the parties' Memorandum of Understanding.

Plaintiff filed suit against ProActive alleging: breach of contract; multiple counts of tortious interference with a contract; interference with contract expectancy; and unjust enrichment. Amended Complaint, Dkt. 16. Defendant timely filed its answer and, following discovery, the parties moved for summary judgment. On April 17, 2020, District Judge T.S. Ellis, III granted in part and denied in part Defendant's Motion for Summary Judgment (Dkt. 72) and denied Plaintiff's Motion for Summary Judgment (Dkt. 90). Dkt. 253. The Court dismissed Plaintiff's tortious interference claims (Counts II–V) and unjust enrichment claim (Count VI). The Court denied Defendant's motion as to Plaintiff's breach of contract claim (Count I). On August 7, 2020, the Court granted Defendant's Motion *in Limine* (Dkt. 212) to preclude Plaintiff

1

from introducing any evidence relating to any claimed damages. Dkt. 327. As a result, Plaintiff was only permitted to proceed to trial on its breach of contract claim for nominal damages.

On November 12, 2021, this case was reassigned to District Judge Patricia Tolliver Giles. The parties waived a jury trial (Dkt. 430) and a bench trial was held on January 5 and 6, 2022. At trial, the parties offered eight witnesses and hundreds of exhibits. Following trial, the parties submitted revised proposed findings of fact and conclusions of law. Dkts. 474, 479. Based on the evidence and witnesses presented at trial, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

*SOF RAPTOR III Contract*

1. Plaintiff ATG is a Nevada corporation with a principal place of business in Ohio that provides advanced tactical training services. Dkt. 461 at 145; Dkt. 463 at 102–103. Adam Newbold is the President and CEO of ATG. Dkt. 463 at 29. Prior to the time period at issue in this case, ATG did not have any federal contracting experience. Dkt. 463 at 31.

2. Defendant ProActive is a Virginia corporation with its principal place of business in Florida that provides engineering services and manufacturing for the United States military. Dkt. 461 at 130, 145; DEX 20. All of ProActive's business is in the federal government contracting world. Dkt. 461 at 130. Robert Acevedo is the founder and CEO of ProActive, and has been involved in federal government contracting since 1980. *Id.* at 129, 131.

3. In 2011, the United States government announced that it was starting the acquisition process for the United States Army Special Operations Forces RAPTOR III ("SOF RAPTOR III"). *Id.* at 85, 132. Prior to SOF RAPTOR III, the government had issued SOF

2

RAPTOR I and SOF RAPTOR II, which primarily involved engineering, engineering services, and manufacturing of military training systems. *Id.* at 132.

4.      ProActive had submitted proposals for SOF RAPTOR I and II, but its proposals were not accepted. *Id.* at 84.  For ProActive to be competitive for the SOF RAPTOR III contract, Mr. Acevedo sought to work with someone with special operation forces experience. *Id.* at 90–91.  Although Mr. Acevedo had formerly served in the army for nine years, he did not have a special operation forces background.  *Id.* at 82–83, 130–31.  At that time, Mark Lampman, then-project manager for ProActive, was the only ProActive team member with a special operation forces background.  *Id.* at 87; Dkt. 463 at 33.  However, as Mr. Lampman was preparing to leave ProActive at that time, he recommended Mr. Newbold to Mr. Acevedo.  Dkt. 461 at 89–90.

5.      Mr. Newbold was a former Navy SEAL Intelligence Specialist, Special Operator. Dkt. 463 at 30.  He retired from the Navy Reserve, having served for a total of twenty-four years. *Id.*  Thus, he had the special operations forces experience Mr. Acevedo sought.  *Id.*  Mr. Newbold and Mr. Lampman were friends and had also worked together.  *Id.* at 33.

6.      On November 21, 2011, Mr. Acevedo contacted Mr. Newbold about the possibility of ProActive and ATG working together for SOF RAPTOR III.  Defendant's Exhibit ("DEX") 509-1, ¶ 1; Dkt. 461 at 89, 92.  Mr. Acevedo and Mr. Newbold eventually agreed to partner ATG and ProActive in a joint venture for SOF RAPTOR III.  Dkt. 461 at 92–93.

7.      Mr. Acevedo prepared the initial draft of a Memorandum of Understanding ("MOU") between ProActive and ATG to create a joint venture ("JV") for the purpose of bidding on and performing the SOF RAPTOR III contract.  Initially, Mr. Acevedo circulated the

3

draft to ProActive employees. *Id.* at 93–94.  On June 8, 2012, ProActive forwarded the draft

MOU to Mr. Newbold. *Id.* at 99.  The draft MOU set forth that membership interests and voting

rights in the JV would be apportioned as 67% for ProActive and 33% for ATG.  The draft MOU

also identified three ProActive-designated Board members and left two blank spaces for Mr.

Newbold to indicate who, in addition to himself, would serve on the Board from ATG. *Id.* at 98–

99.

      8.      On June 25, 2012, in an email to Mr. Acevedo, Mr. Newbold wrote: "The MOU

looks ok.  It's been pointed out frequently how you'll basically have control to cut us out or do

whatever you wish.  I'm actually okay with that.  As far as I'm concerned, we are riding your

coat tails on this one.  I think you'll find that once we get a little working capital, ATG has some

amazing capabilities and excellent reach-back.  I'm confident that we are what you need and you

won't want to look elsewhere."  DEX 5.

***Terms of the MOU***

      9.      On July 27, 2012, Mr. Acevedo and Mr. Newbold executed the MOU on behalf of

ProActive and ATG, respectively.  Dkt. 461 at 101; Plaintiff's Exhibit ("PEX") 17.  Section 1.0

of the MOU identified ProActive and ATG as the Members of the JV and the JV's goals:

> The goals of the JV are to secure the single award under the SOF
> RAPTOR III IDIQ; bid on task orders offered under the SOF RAPTOR III
> IDIQ award, and to perform the services required to support successful
> execution of awarded task orders in accordance with the terms and
> conditions governing the JV as outlined herein and as may be further
> refined and agreed to in the course of JV operation.

PEX 17, § 1.0.

      10.      Section 5.0 of the MOU established the legal structure of the JV.  In pertinent

part, Section 5.0 provided that the JV would be conducted through a limited liability company

("LLC"), RAPTOR Training Services ("RTS" or "Raptor LLC"), which would be incorporated
in the Commonwealth of Virginia.  PEX 17, § 5.0.  Section 5.0 also provided that:

> Initial membership in the L.L.C. will consist of the Members identified in
> Section 1.0, with membership interests and voting rights apportioned
> among the Members according to the following schedule:
> i.       ProActive: 67%
> ii.      ATG: 33%

PEX 17, § 5.0.

11.      Section 7.0 of the MOU established a six-person Board of Directors comprised of
three individuals from ProActive and three individuals from ATG.  Section 7.0 also provided that
"[t]he JV Board is responsible for oversight management of the JV."  PEX 17, § 7.0.  Section 7.0
did not specify a voting structure amongst the Members different from the voting structure
designated in Section 5.0.  PEX 17, § 7.0.

12.      Section 8.0 of the MOU designated ProActive as the "Managing Member for
[certain] day-to-day management purposes" that were identified in the MOU.  PEX 17, § 8.0.

13.      The MOU also included a non-restriction of opportunities provision.  PEX 17, §
11.0.  In pertinent part, that provision provided:

> Each Member shall have the right to pursue any task order opportunity placed on
> the SOF RAPTOR III IDIQ contract awarded to the JV for the duration of the JV
> contract, except to the extent provided in the JV governing documents, so long as
> the opportunity is so relevant to the Member's line(s) of business as to minimize
> the potential for unreasonable increased risk to other Members through
> unsatisfactory performance.

*Id.*

14.      Section 12.5 of the MOU established the task order process.  Under the MOU,
Members were responsible for checking the Federal Business Opportunities ("FBO") postings or
dedicated SOF RAPTOR III Indefinite Delivery Indefinite Quantity ("IDIQ") opportunities

5

website for pending or potential task order opportunities. PEX 17, § 12.5.1. This review included whether (1) the task order opportunity was brought to the prime contract by the Member; (2) the Member has been actively marketing the task order opportunity; (3) the Member wishes to lead the task order effort; (4) the Member wishes to participate in, but not lead, the task order effort; and (5) the Member does not wish to participate in the task order effort. *Id.* The MOU also provided that the JV Board (or its designated representatives) would convene as needed to review the known factors surrounding each task order opportunity. *Id.* Those Board members would then indicate whether its organization would participate in the opportunity at issue. *Id.* In the event that only one Member elected to pursue a task order, that Member could pursue the task order as task order lead and seek out subcontractors outside of the JV, if necessary. *Id.*

15.     Section 12.5.2 of the MOU identified how task order leads would be designated, and their responsibilities. PEX 17, § 12.5.2. Section 12.5.2 provided that each task order would be managed by a single Member—the task order lead—who would be responsible for all efforts associated with the task order, from the proposal through the order's completion. *Id.* It further explained that given the fact that Members possess "generally exclusive areas of expertise and are recognized within the simulation industry as successful competitors in those areas," in most instances the task order lead would be the Member whose "recognized expertise" encompassed the majority of the primary and vital task order requirements. *Id.*

16.     The task order process further entailed identifying task order opportunities within the special operations forces community and registering those opportunities with the Managing Members and making them known to the Program Executive Officer for Soft Training Systems

("PEO STRI") and its contractor's representative, Rick Matthews.  Dkt. 461 at 137–38; Dkt. 463 at 115.

17.     The MOU contained a dispute resolution provision which provided that:

> any dispute that cannot be resolved to the disputing parties' mutual satisfaction, after good faith negotiations, within ninety (90) calendar days from the date the written claim is received by the other party or by the JV Board, or such additional time as such parties agree upon in writing, may be settled by appropriate legal proceedings, including without limitation, binding arbitration under the Comprehensive Arbitration, such arbitration to be held in Fairfax County, Virginia.

PEX 17, § 13.0.

18.     The MOU also contained a termination provision:  "If a Member . . . is terminated from the JV for its breach of the MOU or the JV governing documents, the remaining Members will be entitled to purchase the terminating Member's interest in the L.L.C. on a basis proportional to their membership interests, for a total price of $1,000."  PEX 17, § 20.0.  The MOU did not specify the process of terminating a Member from the JV or what constituted a breach of the MOU.

19.     The MOU contained a Virginia choice of law provision and explicitly stated that "the MOU is the complete agreement of the parties concerning its subject matter, and supersedes all prior communications and discussions concerning its subject matter."  PEX 17, §§ 23, 24.

20.     The MOU contemplated the creation of a JV operating agreement.  PEX 17, § 6.0.

21.     ProActive paid $250,000.00 in RTS's startup costs, covering staff, generation of documentation, state filings, and the writing of an execution of the proposals.  Dkt. 461 at 137. ProActive also signed as the financial guarantor of RTS.  *Id.* at 141–42; DEX 20.  ATG did not

pay any startup cost nor did it serve as a guarantor for RTS.  Dkt. 461 at 137, 142–43; Dkt. 463 at 107–08.

***Award of SOF RAPTOR III Contract***

22.     In 2012, the United States government issued a request for proposals ("RFP") for SOF RAPTOR III IDIQ.[1]  Dkt. 461 at 85, 132.  In September 2012, RTS submitted its proposal for SOF RAPTOR III.  *Id.* at 103.  On February 13, 2014, the government awarded RTS the SOF RAPTOR III contract and RTS accepted the award.  *Id.* at 106, 146–47; DEX 509-1, ¶ 6; DEX 29.  The award was an IDIQ task order contract (DEX 509-2), which provided for services but did not specify a quantity.  *See* DEX 29.  The minimum order on the contract was $10,000.00 with an initial cap of $97,800,000.00.  *Id.*  The government had discretion to place a task order on the SOF RAPTOR III contract or use another contract vehicle.  *Id.*

23.     Ted Mundelein served as RTS's Program Manager for the contract and is also ProActive's Chief Operating Officer.  Dkt. 461 at 138; Dkt. 464 at 120–21.  As Program Manager of SOF RAPTOR III, Mr. Mundelein served as the primary interface with the government's program manager, Rick Matthews; had primary responsibility for managing all task orders that were part of SOF RAPTOR III; and ensured that the government's requirements were met.  Dkt. 464 at 120–21.  Mr. Mundelein had previously served as the Program Manager of SOF RAPTOR I and was also involved in SOF RAPTOR II.  *Id.* at 121.

24.     RTS held weekly meetings with the government to discuss pending and future task orders.  *See, e.g.*, Dkt. 464 at 92–93.  Both ProActive and ATG were able to attend the

---

[1] IDIQ is a contract that the government enters when the government has undefined requirements that it wants to pursue over a period of performance.  Dkt. 461 at 132.

meetings, which were held at the same time each week either in person or by phone. *Id.*

Additionally, ProActive and ATG communicated outside of these meetings regarding task

orders, preparing task order proposals, and disseminating government guidance. *Id.* at 123. Mr.

Mundelein usually interfaced with ATG via Mr. Newbold. *Id.* at 122.

25.     During the relevant time period, Kathy Keyser served as both ProActive's and

RTS's Contract Manager. Dkt. 464 at 88–89, 94. When the government placed task orders on

the SOF RAPTOR III contract, Ms. Keyser forwarded the task orders to ProActive and ATG. *Id.*

at 89. The role of a contract manager is to understand the rules and regulations of solicitations,

the contracts, and small business regulations, and to make sure the company adhered to the

contract rules and regulations. *Id.* at 90, 94. Because ATG did not have a contract manager, Ms.

Keyser communicated directly with Mr. Newbold and offered assistance regarding the rules,

regulations, and necessary paperwork and contracts. *Id.* at 89–91.

26.     The SOF RAPTOR III contract incorporated certain provisions of the Federal

Acquisitions Regulations ("FAR"). In particular, it incorporated clause § 52.219-14 Limitations

on Subcontracting (Nov. 2011), also known as the 51% Rule.[2] DEX 509-1, ¶ 7. This limitation

on subcontracting required RTS to perform at least 50% of the labor under the contract

organically. Dkt. 460 at 75. Only work performed by RTS's Members—ProActive and ATG—

counted towards compliance with this rule. *Id.* Any work performed by subcontractors or

affiliates did not count toward compliance. *Id.* at 76–77.

---

[2] At trial, witnesses referred to this rule as the 51% Rule. But in the parties' Stipulated
Statement of Uncontested Facts, they jointly referred to this as the 50% Rule. DEX 509-1, ¶ 7.
For consistency, the Court will use "the 51% Rule" throughout its Findings of Fact and
Conclusions of Law.

27.     On January 2, 2013, the National Defense Authorization Act for Fiscal Year 2013 was signed into law.  The Act changed the Limitations on Subcontracting clause such that employees of small business subcontractors now counted as "employees of the concern" for purposes of compliance with the 51% Rule.  Dkt. 464 at 100.  If this change applied to the SOF RAPTOR III contract, work performed by any small business subcontractors would count towards RTS's performance and favorably impact RTS's compliance with the 51% Rule.  This change, however, was not self-executing.[3]  Dkt. 460 at 40.

***Performance Under the Contract and 51% Rule***

28.     During one of RTS's weekly meetings with the government, Mr. Matthews noted the government's concern (specifically, government contracting officer Ana Rios's concern) about RTS's compliance with the 51% Rule to Mr. Mundelein.  Dkt. 464 at 97, 130.

29.     On October 6, 2015, Richard Stockton, then-Co-Chief Executive Officer of ProActive and Chief Executive Officer of RTS, sent Mr. Newbold an email alerting him that the issue of compliance with the 51% Rule had been raised in the meeting.  DEX 76; Dkt. 460 at 7–9, 67.  The email explained that the Defense Contracting Management Agency "keeps track of the subcontracted amounts, so this concern may be coming from them.  It is an absolute contractual requirement to do 51% of the labor.  There's usually little concern if the numbers are close, but right now they are not.  We will have to have some discussions about all the possibilities."  DEX 76; Dkt. 461 at 9.

---

[3] The implementation process could take years.  The Small Business Association process requires public notice and comment periods followed by the FAR implementation process.  *See, e.g.*, Dkt. 461 at 11–12.  After that, the procuring contracting officer must implement the new rule into the contract.  *Id.* at 12.

10

30.    ProActive anticipated RTS complying with this rule.  Historically, SOF RAPTOR contracts had been engineering focused.  Dkt. 460 at 76.  Due to its engineering background, ProActive anticipated performing that work.  *Id.*  The initial task orders were engineering related. Dkt. 461 at 10.  ProActive, however, still subcontracted out the work to the company that previously handled SOF RAPTOR II because the initial SOF RAPTOR III task orders were follow-on work related to SOF RAPTOR II, and involved proprietary work of that company.  *Id.* In actuality, SOF RAPTOR III was more training exercise focused.  Dkt. 460 at 76.

31.    Although training exercises were viewed as being in ATG's "wheelhouse," ATG also subcontracted out a majority of its work on the task orders where it served as lead.  Dkt. 463 at 120–22; Dkt. 464 at 47–49.  Specifically, those task orders on which ATG served as lead generated between $6 to $7.1 million in revenue and approximately $5.6 million was paid to subcontractors.  Dkt. 464 at 47.  ATG was only performing approximately 17% of its work organically.  *Id.* at 47–48.

32.    According to advice Mr. Stockton obtained from a Small Business Association ("SBA") consultant, the change to the 51% Rule was not self-executing.  Dkt. 461 at 10–11.  On December 11, 2015, Mr. Stockton sent Mr. Newbold, Mr. Acevedo, and Mr. Mundelein an email conveying the consultant's advice that the new rule regarding contracting limitation "is probably not self-executing and therefore implementation will have to await implementation instructions for FAR clause.  This, unfortunately, is not in the best interest of SOFRAPTOR[sic] Training Services."  DEX 77.  In his email, Mr. Stockton also warned that they needed to discuss how RTS could comply with the 51% Rule and suggested adding another small business into the JV in a non-voting capacity who could bring significant contract actions.  *Id.*

11

33.     Through Ms. Keyser, ProActive contacted the government's contracting officer,

Ms. Rios, and contract specialist, Sherry Alexander,[4] to determine when the changes to the 51%

Rule might go into effect.  DEX 81; Dkt. 464 at 94–99.  ProActive also requested a waiver of the

51% Rule, which required modifying the SOF Raptor III contract.  Dkt. 464 at 98–99.  Even if

changes to the 51% Rule went into effect, it would not alter the requirements of the SOF

RAPTOR III contract unless or until the government and RTS modified the contract to reflect the

new regulation.  DEX 509-2, ¶ 47.  If, however, compliance with the 51% Rule was waived,

RTS could count work performed by small business subcontractors as work performed by RTS.

Dkt. 464 at 99.

34.     After conferring with government attorneys, Ms. Alexander sent an email

confirming that the current limitation on subcontracting would remain in effect until the changes

to the 51% Rule were implemented and there was a modification of the contract.  DEX 81.  Ms.

Alexander also stated that it was likely that the new 51% Rule would take effect prior to the

contract's end, as only two years had passed of the five-year contract.[5]  *Id.*

35.     On January 7, 2016, Mr. Stockton forwarded Ms. Alexander's email to Mr.

Newbold.  DEX 81.  Mr. Stockton also reiterated discussions on bringing another company into

the JV that could bring organic work into the JV.  *Id.*  Ms. Keyser also forwarded Ms.

---

[4] The government contracting specialist handles the day-to-day contract operations on behalf of
the government.  Dkt. 464 at 94–95.  The contracting specialist, however, does not have signing
authority.  *Id.* at 95.  The government contracting officer has the authority to sign and modify a
contract on behalf of the government.  *Id.*

[5] In actuality, the changes to the 51% Rule did not take effect until September 2021—after the
end of the contract.  Dkt. 464 at 103, 105.

12

Alexander's email to Mr. Newbold (Dkt. 464 at 104); Mr. Newbold expressed his belief that Ms. Alexander's position was incorrect. *Id.* at 104–05.

***Attempts to Negotiate the Operating Agreement and Bring RTS into Compliance with the 51% Rule***

36.     From July 2012 to March 2016, RTS, ProActive, and ATG operated under the MOU, which functioned as the *de facto* operating agreement; the parties never attempted to negotiate an operating agreement. Dkt. 461 at 108–09. The MOU was signed only by ProActive and ATG. PEX 17, § 25.0. In order for ATG to add Class B members to RTS, an operating agreement signed by all parties—ATG, ProActive, and the Class B members—needed to be executed, per request of the potential Class B members.[6] Dkt. 463 at 19, 23.

37.     Having been warned by the government that RTS needed to come into compliance with the 51% Rule, ProActive believed that timing was essential to executing an operating agreement and bringing on Class B members. Dkt. 461 at 18–19.

38.     On March 21, 2016, ProActive sent the first draft of the Operating Agreement ("ProActive's first draft") to ATG. Dkt. 461 at 16; DEX 101; DEX 102. ProActive's first draft included admission of Class B members. Dkt. 461 at 17; DEX 102. Consistent with the MOU, ProActive's first draft provided that ProActive would be the Managing Member. Dkt. 461 at 17. ProActive's first draft also provided that ProActive and ATG would split the 6% management fees for any work completed by Class B members. DEX 102; Dkt. 461 at 18.

---

[6] As a majority Member and with its voting distribution, ProActive had the authority to unilaterally add Class B members under the MOU. Dkt. 463 at 22–23. While the MOU did not require the addition of Class B members, it did contemplate that additional members could be added to the JV. Dkt. 461 at 117–18; PEX 17, § 8.0.

39.    After multiple follow-up requests from Mr. Stockton regarding ProActive's first draft, ATG responded approximately five weeks later that it needed more time to respond to the operating agreement draft. Dkt. 461 at 21.  On April 13, 2016, Mr. Stockton sent Mr. Newbold an email raising the issue of RTS's compliance with the 51% Rule and providing the actual numbers for the amount of work that had been subcontracted. Dkt. 461 at 20–21.  As of that date, subcontractors had performed 88.36% of the work and RTS had only performed 11.64% of the total value received under the contract. DEX 509-1, ¶ 12; DEX 123.  Mr. Stockton emphasized the need to add Class B members to bring RTS into compliance with the 51% Rule. DEX 123.

40.    On April 27, 2016, ATG sent ProActive a revised draft Operating Agreement ("ATG's first draft") that removed the process for admitting new Class B members. DEX 141; Dkt. 461 at 24.  ATG also limited the Class B members to those listed in Exhibit A of ATG's first draft, which identified only Xtenfer, a consulting company, as a potential Class B member.[7] Dkt. 461 at 23.  Around this time, ATG had also sent Xtenfer a draft affiliate agreement.[8] DEX

---

[7] RTS was also considering several other potential Class B members, including Oak Grove, Terran Corporation, and F3EA. Dkt. 461 at 16–17.

[8] In other words, ATG attempted to sign on a company that was identified as a potential RTS Class B member as an ATG affiliate. *See, e.g.*, DEX 491; Dkt. 464 at 58–59.  This, however, would not aid in RTS's compliance with the 51% Rule, because affiliate work is not considered constituent work, and does not contribute toward the 51% Rule. Dkt. 461 at 19–20; DEX 509-2, ¶¶ 34, 49.  Instead, the affiliate arrangement would benefit only ATG, which would receive a percentage of the profits stemming from the affiliate work. Dkt. 461 at 20; Dkt. 464 at 63.

The Court acknowledges Mr. Newbold's speculation that ProActive's interpretation of the 51% Rule is incorrect. *See, e.g.*, Dkt. 463 at 78–80; Dkt. 464 at 63.  Mr. Newbold, however, had no prior federal government contracting experience. Dkt. 463 at 31.  Thus, the Court credits the testimony of both Mr. Stockton and Mr. Mundelein reflecting ProActive's view that affiliate work would not count toward the 51% Rule, Dkt. 460 at 48; Dkt. 464 at 127, and the expert

491. ATG's first draft also removed ProActive as the Managing Member and shifted some of the day-to-day duties from the Managing Member to the Board of Directors. DEX 141. Additionally, ATG's first draft altered the voting rights distribution of ProActive (67%) and ATG (33%), as reflected in Section 5.0 of the MOU (PEX 17).[9] DEX 141. ATG's first draft provided instead that ATG and ProActive would have a 50/50 voting split. *Id.*; Dkt. 461 at 25–26.

41. On April 28, 2016, ProActive advised ATG that ATG's first draft, including the proposed revision to the voting rights apportionment, contradicted the MOU. ProActive further explained that voting rights as apportioned in the MOU granted 67% to ProActive and 33% to ATG. DEX 146; Dkt. 461 at 27.

42. On May 19, 2016, ATG sent ProActive another draft of the Operating Agreement ("ATG's second draft"). ATG's second draft conditioned the solicitation and admission of Class B members on the unanimous consent of Members. DEX 165. In the email accompanying ATG's second draft, Mr. Newbold acknowledged "the need to bring select companies on board immediately as strategic B leg members," and stated that he understood that it would be "in the best interest of RTS as a whole." DEX 164; Dkt. 461 at 28.

43. During the negotiation process and after sending ATG's second draft to ProActive, ATG continued to lobby potential Class B members to sign up as ATG affiliates, and requested that they keep their communications confidential. DEX 417; DEX 418; DEX 491.

---

report of Dr. James A. Hughes, Jr. confirming ProActive's interpretation that affiliates did not count toward the 51% Rule. DEX 509-2, ¶¶ 34, 49.

[9] Section 5.0 of the MOU does not list any Board voting exception to the 67/33 voting split indicated.

15

44.     On June 3, 2016, ProActive emailed ATG an updated draft Operating Agreement ("ProActive's second draft"), removing ATG's veto power with respect to Class B members. DEX 169; DEX 170.  This was the final draft exchanged between the parties.  Dkt. 461 at 30–31.

45.     In October 2016, the PEO STRI reached out to RTS about potentially moving several large military training exercises ("military training projects") to the SOF RAPTOR III contract. Dkt. 461 at 32–34.  This move would potentially result in $20 to $40 million in task orders for RTS.  *Id.* at 35.  The potential move also created further concern about RTS's compliance with the 51% Rule because if RTS could not perform the work organically, it would result in $20 to $40 million of additional subcontracted work.  *Id.*

46.     On October 19, 2016, Mr. Stockton sent an email to Mr. Newbold informing him of the conversation with the PEO STRI.  DEX 183; Dkt. 461 at 35–36.  Mr. Stockton later explained that the PEO STRI had reached out in part to ensure RTS could handle the relevant contracts, and that, prior to responding that RTS could take on the work, Mr. Stockton and Mr. Newbold needed to discuss critical changes on RTS's end.  Dkt. 461 at 36.

47.     On October 25, 2016, ProActive informed ATG that RTS had learned in a weekly meeting with the government that the government contracting officer, Jason Graham, had expressed concerns with RTS's ability to comply with the 51% Rule.  DEX 186; Dkt. 461 at 38.

48.     On October 27, 2016, Mr. Stockton advised Mr. Newbold that Mr. Matthews reiterated the PEO STRI's request that RTS confirm that RTS could organically perform the work on the military training projects.  DEX 187.  Mr. Stockton told Mr. Newbold that the government indicated that another company had expressed interest in picking up one of the military training projects, which created concern that the rest of the work from these projects

16

would flow to that company instead of RTS. *Id.*; Dkt. 461 at 34–36. Mr. Stockton also advised

that Mr. Acevedo would be meeting with the Army Office the following Monday to discuss the

contracts for the military training projects and whether RTS could take on the work and be

compliant with the 51% Rule. DEX 187. Mr. Stockton emphasized the need to reach an

agreement between ATG and ProActive on how to move forward no later than the following

Monday morning. *Id.*

49.     On October 29, 2016, ProActive and ATG met to discuss the proposed Operating

Agreement. At the meeting, Mr. Newbold continued to assert the need for all RTS Board

members to hold equal voting rights instead of the split contained in the MOU (67% ProActive

and 33% ATG). Dkt. 461 at 40–41; DEX 197.

***ATG's Termination from the JV***

50.     On November 1, 2016, ProActive sent ATG a letter signed by Mr. Acevedo

indicating ATG was in material breach of the MOU. Dkt. 461 at 107–08; DEX 199. The letter

stated that in the MOU, the parties "expressly agreed that for the initial membership in the JV

Entity ProActive would have 67% and ATG would have 33%, respectively, of both the

membership interests and the voting rights of the JV Entity." DEX 199. The letter also noted

that ProActive had drafted the Operating Agreement consistent with Mr. Newbold's agreement

in writing on February 29, 2016 that ProActive could draft such an Agreement. *Id.* The letter

further contended that ATG conditioned its consent to the Operating Agreement on changing the

membership interests and voting rights of the JV entity to 50/50. *Id.* Mr. Acevedo wrote:

> Your insistence on this substantial departure from the agreed membership
> interests and voting rights in the MOU is a fundamental breach of the MOU.
> Your unwillingness to complete an Operating Agreement on the most material

17

terms of the MOU leaves ProActive no alternative but to terminate ATG's membership in the JV for fundamental breach of the MOU.

*Id.* He further referenced the parties' knowledge that there was an "urgent need" to add non-voting and non-profit sharing Class B members to the JV to fully perform its duties under the prime contract it held with the government. *Id.* Mr. Acevedo acknowledged in the letter that both ATG and ProActive agreed to provide for such Class B members in the Operating Agreement. *Id.* Mr. Acevedo continued:

> However, ATG's refusal to complete the Operating Agreement without changing the parties' fundamental voting and membership interests has interfered with and damaged the JV Entity's ability to perform its prime contract opportunities and obligations as prime contractor, as well as secure the additional work referenced above. This matter's urgency has not abated, and ProActive is compelled to terminate ATG's membership in the JV Entity for the above-stated reasons.

*Id.* The letter provided a November 4, 2016 deadline by which ATG could reverse course and agree to ProActive's second draft of the Operating Agreement. *Id.* The November 4, 2016 deadline aligned with the deadline the PEO STRI had given RTS to indicate whether or not RTS could become compliant with the 51% Rule. Dkt. 463 at 15. ATG never signed onto the Operating Agreement.

51.    On November 8, 2016, ProActive sent a letter to ATG signed by Mr. Acevedo immediately terminating ATG from the JV ("termination letter"). DEX 207. According to the termination letter, ATG was being terminated for the reasons set forth in ProActive's November 1, 2016 letter, as well as: (1) "[ATG's] prolonged refusal to operate in accordance with the MOU, including without limitation, its repeated demand for a fifty-fifty share of voting rights and membership interests in the Raptor Training Services . . . in contravention of [Section 5.0 of] the MOU"; (2) ATG's repeated demands for task order lead positions on tasks for which it did

not have the requisite expertise; (3) ATG's poor performance on other tasks where it was task order lead; and (4) for directly contacting the government customer.[10]  *Id.*

52.     In particular, ProActive contended in the termination letter that despite the unequivocal language in Section 5.0 of the MOU indicating ProActive would receive 67% of voting rights and membership interests and ATG would receive 33%, ATG continued to demand "voting rights and membership interests (profits) to which it fundamentally is not contractually entitled." *Id.* ProActive further accused ATG of refusing to negotiate in good faith with respect to the Operating Agreement, and frustrating ProActive's efforts to put an Operating Agreement into place for nine months. *Id.*

53.     The primary reason ProActive identified in the termination letter as to why ATG was in breach of the MOU was ATG's attempt to change the 67/33 voting rights split to a 50/50 deal whereby ATG had veto rights over Board decisions. Dkt. 463 at 17–18. Although ProActive had listed several reasons why ATG was in breach of the MOU, they were minor in nature and were not the ultimate cause of termination. *Id.*

54.     Finally, the termination letter indicated that RTS remained willing to work with ATG as a subcontractor "in areas where ATG is able to provide credible and effective support under task orders or task order segments within ATG's training support areas of expertise and experience." DEX 207.

---

[10] Mr. Acevedo testified that this portion of his letter referenced the Master Subcontract Agreement, which allegedly prohibited ATG from contacting the government.  The Master Subcontract Agreement, however, is not referenced in, or directly incorporated into the MOU. Dkt. 461 at 122–26.

## CONCLUSIONS OF LAW

The parties do not contest that the MOU was a valid contract.  The prevailing issue is whether there was a breach of the MOU, and if so, by which party.  ATG argues ProActive breached the MOU by (1) unreasonably interfering with its ability to pursue and perform task orders for SOF RAPTOR III reasonably related to its line of business in contravention of Sections 11.0 and 12.5 of the MOU, (2) stripping its management oversight role as a holder of three of the six JV Board of Directors seats in contravention of Section 7.0 of the MOU, and (3) terminating it from the JV in contravention of Sections 13.0 and 20.0 of the MOU and Virginia law.  ProActive alleges ATG materially breached the MOU by (1) attempting to renegotiate its voting rights in contravention of Section 5.0 of the MOU and (2) impeding RTS's compliance with the SOF RAPTOR III contract.

The elements for breach of contract are: (1) a legal obligation between the parties, (2) a violation or breach of that obligation, and (3) consequential injury or damage to the complaining party.  *Ramos v. Wells Fargo Bank, NA*, 770 S.E.2d 491, 493 (Va. 2015) (internal quotation marks omitted).  However, under Virginia law, "'a party who commits the first material breach of a contract is not entitled to enforce the contract,' and the breach excuses the nonbreaching party from future performance."  *Bayer Cropscience LP v. Albemarle Corp.*, 696 Fed. App'x. 617, 622 (4th Cir. 2017) (internal brackets omitted) (citing *Horton v. Horton*, 487 S.E.2d 200, 203 (Va. 1997)).  "A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Horton*, 487 S.E.2d at 204.

20

As stated above, it is undisputed that the MOU was a valid contract between the parties.[11] It is also undisputed that ProActive terminated ATG from the JV. *See, e.g.*, Dkt. 460 at 43; Dkt. 461 at 106–08. Given that both parties allege breach, the relevant question is which party materially breached the MOU first, if at all. The Court will evaluate the claims in chronological order. Accordingly, the Court must first decide whether ProActive materially breached the MOU by (1) blocking ATG's ability to perform task orders or (2) stripping ATG of its oversight rights. Next, considering those actions which occurred prior to ATG's termination, the Court must decide whether ATG materially breached the MOU by (1) attempting to renegotiate its voting rights and/or (2) impeding RTS's compliance with the contract. Finally, the Court must decide if ProActive materially breached the MOU by terminating ATG from the JV.

Under the MOU, the parties had a legally enforceable obligation to work toward the goals of the JV: to (1) secure the SOF RAPTOR III IDIQ, (2) bid on task orders offered under that award, and (3) perform the services required to support successful execution of the award. PEX 17, § 1.0.

***ProActive's Alleged Interference with ATG's Ability to Pursue and Perform Task Orders***

ATG alleges that ProActive barred ATG from performing work for the federal government that ATG was entitled to perform under the contract, which interfered with ATG's ability to pursue and perform task orders in violation of Section 11.0 of the MOU. This was not

---

[11] Despite the parties' disagreement about certain provisions of the MOU and breach of its terms, neither party disputes that the MOU was the *de facto* operating agreement of the JV. The Court previously ruled that the MOU constitutes an express contract between the parties. *See* Dkt. 252 at 15.

borne out by the evidence at trial.  Instead, the evidence at trial established that both ATG and ProActive could pursue and perform task orders.

The MOU required ProActive to create and maintain a web-based JV portal for the dissemination of pending and in-process task order information.  PEX 17, § 12.5.1.  As acknowledged by Mr. Newbold and proven at trial, ProActive created the task order portal.  Dkt. 463 at 84; *see also* Dkt. 464 at 125.  Due to technical difficulties, ATG was unable to access the portal.  Dkt. 464 at 125.  The portal, however, was not the only means by which to obtain information about pending and future task orders.

Task orders were also discussed at weekly meetings that were accessible by phone.  *See, e.g.*, Dkt. 464 at 92–93.  The testimony of both Ms. Keyser and Mr. Mundelein credibly established that RTS held weekly meetings with the government, to which Mr. Newbold was invited, but infrequently attended.  *Id.* at 92–93, 121–23.  The meetings occurred at ProActive's facility.  *Id.* at 92.  Ms. Keyser explained that the government attended the meetings in-person and a dial-in option was provided for anyone who could not attend the meeting in-person.  *Id.* The meetings were held at the same time every week, and discussed current task orders, the status of the work, financials regarding the program, and future task orders.  *Id.* at 92–93. Similarly, Mr. Mundelein testified that in the weekly meetings, attendees would discuss any issues with Mr. Matthews, as well as any available task orders or future task orders.  *Id.* at 122. In those meetings, Mr. Matthews would also indicate where the government was in the task order process and whether RTS should prepare to receive a task order or request for proposal from the government.  *Id.* at 93.  Additionally, Mr. Acevedo testified that, to enhance communication between the two companies, he offered ATG free office space at ProActive's facility.  Dkt. 461

at 146.  Mr. Newbold did not take him up on that offer.  Accordingly, Mr. Newbold chose to limit his access to and involvement in conversations about current and future task orders with the government.  *See, e.g.*, Dkt. 464 at 26–27.

ATG alleges that during the course of the contract, ProActive further breached the MOU by preventing ATG from performing work that was in its area of expertise.  *See, e.g.*, Dkt. 463 at 84.  However, in many instances, ATG lacked the personnel or other capabilities to complete certain live training task orders for which it may have otherwise been suited.  *See, e.g.*, Dkt. 464 at 44–45.  For example, despite representing in a proposal that it had approximately one hundred personnel, ATG later indicated it did not have personnel on hand to complete certain tasks.  *Id.* at 15–18.  In fact, the government project manager, Mr. Matthews, testified that ATG was not staffed to handle large training exercises.  *Id.* at 18–19.  Moreover, Mr. Newbold testified about a single instance where ATG believed it was qualified to handle a task order (Task Order #6) and believed it should have gone to ATG.  Dkt. 463 at 55–57.  Once Mr. Newbold raised the issue with ProActive, he was made the task order lead.  *Id.*

Based on the evidence adduced at trial, the Court finds ProActive did not interfere with ATG's ability to perform or pursue task orders in violation of the MOU.

### *ProActive's Alleged Breach by Stripping ATG of its Oversight Duties*

ATG also alleges ProActive breached Section 7.0 of the MOU by stripping ATG of its management oversight role as holder of three of the six seats on RTS's Board of Directors. Section 7.0 of the MOU indicates the JV Board of Directors is responsible for oversight management of the JV, with three exceptions:  (1) altering the JV's name, (2) altering organizational documents, and (3) other reserved matters as may be set forth in the Operating

23

Agreement. PEX 17, § 7.0. The MOU does not specify what "oversight management" entails. The crux of ATG's allegations appears to be the lack of Board activity.

From RTS's formation in 2012 until 2016, the JV Board never met. Dkt. 463 at 109; Dkt. 464 at 125–26. At trial, Mr. Newbold testified that he requested Board meetings, stating he "demanded it repeatedly." Dkt. 463 at 110. Mr. Newbold also testified that the "need [for a Board meeting] heated up" when negotiating the Operating Agreement and that he was sure that ATG's draft Operating Agreement documents reflected his written request for a Board meeting. *Id.* However, witnesses testified that neither ATG nor ProActive ever requested a board meeting. Dkt. 461 at 25 (Mr. Stockton testified that he never received a written, telephonic, or verbal request for a Board meeting); *Id.* at 140 (Mr. Acevedo testified that neither Mr. Newbold nor anyone else at ATG requested a Board meeting). Mr. Newbold himself conceded that he could not produce anything in writing where he requested a Board meeting, and at trial, ATG did not present such a document.[12] Dkt. 463 at 109–10. Thus, the Court credits the testimony of the witnesses that neither ATG nor ProActive requested a Board meeting. Accordingly, the Court finds the lack of Board activity was not the result of any concerted effort by ProActive; instead, it reflected mutual informality that existed between ATG and ProActive. Because ATG failed to demonstrate that ProActive denied it any management oversight role in contravention of Section 7.0 of the MOU, the Court finds that ProActive did not materially breach the MOU in this way.

---

[12] This lack of memorialization seems odd given the numerous emails exchanged between the parties and produced at trial. *See, e.g.*, PEX 1–2, 6, 11; DEX 66, 76, 77, 81, 84, 101, 110, 123, 134,146, 164, 169, 183, 186, 187.

***ATG's Alleged Breach by Impeding RTS's Compliance with the Contract and Attempting to Renegotiate its Voting Rights***

Because ProActive did not interfere with ATG's ability to pursue task orders or strip it of its managerial oversight role, the Court now looks to ATG's alleged breach of the MOU by impeding RTS's compliance with the contract and attempting to renegotiate its voting rights.

The Court finds that Section 1.0 of the MOU specified that the essential goal of the JV was to secure the SOF RAPTOR III contract, bid on task orders offered under the contract, and to facilitate execution of awarded task orders. PEX 17, § 1.0. The Court also finds that complying with the requirements of the contract, including the 51% Rule, was integral to this goal. Additionally, the Court finds that Section 5.0 of the MOU established membership and voting rights between ProActive and ATG: 67% ProActive and 33% ATG. The Court further finds that ATG impeded RTS's efforts to comply with the SOF RAPTOR III contract in the following ways: (1) frustrating and preventing the admission of Class B members, which became necessary to comply with the 51% Rule; (2) soliciting potential Class B members to work as affiliates, which would benefit ATG, but would not aid RTS's compliance with the 51% Rule;[13] and (3) attempting to expand its voting rights via the Operating Agreement in direct

---

[13] While there was no evidence at trial indicating ProActive, at the time it terminated ATG, was aware of the fact that ATG was soliciting some of the potential Class B members, ProActive's ignorance is immaterial to the question of whether ATG materially breached the contract such that ProActive was excused from its performance. *See Cars Unlimited II, Inc. v. Nat'l Motor Co.*, No. CIV A 206CV305, 2007 WL 2344990, at *7 (E.D. Va. Aug. 15, 2007) (explaining that "it is a well-established precept of contract law that ignorance of a material breach does not preclude a party from thereafter relying on such breach as justification for its failure to perform"); *see also* Restatement (Second) of Contracts § 237 cmt. c (1981) ("[O]ne party's material failure of performance has the effect of the non-occurrence of a condition of the other party's remaining duties . . . even though that other party does not know of the failure.").

contravention of the 67/33 voting rights split between ProActive and ATG, respectively, in the MOU.

The Court credits Mr. Acevedo's testimony that RTS had until November 4, 2016 to inform the government whether it could perform a military training contract while also being compliant with the 51% Rule. Dkt. 463 at 28. Failure to give the government an affirmative answer could result in this and other training contracts being steered away from RTS. *See, e.g.*, Dkt 461 at 34–36. Even before November 4, 2016, ProActive had repeatedly communicated to ATG the urgency of bringing on Class B members because the government had raised the issue of RTS's compliance with the 51% Rule several times. Dkt. 461 at 38–39; DEX 186; DEX 199. RTS needed to add Class B members with the ability to bring organic work into the JV to comply with the 51% Rule. Dkt. 461 at 13–17, 23–24, 147. To accomplish this goal, RTS was considering several potential Class B members, including Xtenfer, Oak Grove, Terran Corporation, and F3EA. *Id.* at 13–17, 23. RTS needed to execute an Operating Agreement to bring on these Class B members. Dkt. 463 at 19.

Instead of acting in the best interest of the joint venture, ATG took advantage of the urgency to execute the Operating Agreement. Specifically, ATG sought to overhaul the structure of RTS and give ATG equal voting rights—which had not been discussed before in the joint venture and that was in direct contravention of the MOU. While ATG appeared to concede on certain issues, such as the overall admission of Class B members, it continued to attempt to expand its voting rights via the Operating Agreement, despite the MOU's provision that voting rights would be 67/33 between ProActive and ATG, respectively. *See* PEX 17, § 5. Even when ProActive gave ATG notice of what it perceived to be a breach of the MOU on November 1,

2016, DEX 199, ATG continued to refuse to sign on to the Operating Agreement without restructuring voting rights.

While Mr. Newbold testified that ATG's goal was to memorialize the terms of the existing MOU into the Operating Agreement, Dkt. 463 at 78, he repeatedly attempted to modify the voting structure from the 67/33 split in the MOU to 50/50. ATG attempts to justify this modification by emphasizing that both Members had an equal number of seats on the Board of Directors. Dkt. 464 at 82–83. The Court finds ATG's argument unpersuasive. The Court does not find that the MOU is ambiguous as to voting rights. The MOU clearly states:

> Initial membership in the L.L.C. will consist of the Members identified in Section 1.0, with membership interests and voting rights apportioned among the Members according to the following schedule:
>
> i.    ProActive: 67%
> ii.   ATG: 33%

PEX 17, § 5. It is clear that the 67/33 structure set forth in Section 5.0 of the MOU was an agreement between the parties to uphold such a structure for all aspects of the JV, including the Board of Director's voting rights.

While ATG conceded to adding Class B members, it would only sign the Operating Agreement if it were given equal voting rights, which directly contradicts the voting interests specified in Section 5.0 of the MOU. ProActive offered ATG three days from the time ProActive gave notice of ATG's breach to reverse course and rectify its breach of the MOU by signing the Operating Agreement. DEX 199. ATG failed to do so. It is clear to the Court that ATG was aware of the justification behind the pressing need to draft an Operating Agreement, even if ATG did not agree with such justification. In fact, Mr. Newbold admitted "the need to bring select companies on board immediately as strategic B leg members," and that it would be

27

"in the best interest of RTS as a whole." Dkt. 461 at 28; DEX 164.  All the while, ATG was

attempting to court the potential Class B members to be exclusive ATG affiliates, an action that

would not help RTS comply with the 51% Rule, and would not accomplish the goal of

successfully bidding on and securing task orders under the SOF Raptor III contract.

Accordingly, the Court finds ATG's actions were done in contravention of the MOU

because it frustrated the JV's purpose as stated in Section 1.0 of the MOU of bringing in and

completing government contracts under the SOF RAPTOR III contract.  Further, ATG's delay in

signing the Operating Agreement was unreasonable because the delay is attributable to ATG's

attempts to renegotiate its voting rights, and in turn, was an attempt to rewrite a core tenet of the

MOU:  the structure of RTS and ProActive's designation as the majority Member.  ATG was

aware that time was of the essence in light of the November 4, 2016 deadline, and was also

aware that RTS could not add Class B members without the existence of an Operating

Agreement.  Despite knowing the only way to work toward the JV's purpose was adding Class B

members, which *required* the creation of the Operating Agreement,[14] ATG continued to delay

the process.  Accordingly, ATG's unreasonable delay and attempts to overhaul the core structure

of the JV's MOU constituted a material breach of Sections 1.0 and 5.0 of the MOU.

---

[14] This was a requirement of the Class B members, not necessarily a legal requirement.  The
Virginia LLC Act provides that, where a company's operating agreement lacks another method,
addition of members is permitted upon a majority vote.  Va. Code § 13.1-1038.1(A)(1).
ProActive, with its 67% voting power, approved of adding Class B members.  This was
sufficient to add the Class B members.  However, because the prospective Class B members
required a formal document memorializing a relationship with RTS, executing the Operating
Agreement was necessary to achieve that effect.

*ATG's Termination from the Joint Venture Was Lawful*

Because ATG materially breached the MOU, ATG could be terminated from the JV
under the MOU. *See* PEX 17, § 20.0. The method by which a Member could be terminated is
not described in the MOU. The Court finds that this reflects an ambiguity within the MOU.

The Court finds the Virginia LLC Act governs ProActive's termination of ATG, because
the MOU is silent on that issue.[15] *See, e.g.*, *In re Min Sik Kang*, E.D. Va. No. 1:15-CV-00953,
2015 WL 5786692, at *5 (E.D. Va. Sept. 30, 2015), *aff'd sub nom. In re Kang*, 664 Fed. Appx.
336 (4th Cir. 2016) ("[w]here the operating agreement is silent, resort must be had to the
statute."); *see also Corinthian Mortg. Corp. v. ChoicePoint Precision Mktg., LLC*, No.
1:07CV832, 2008 WL 2776991, at *3 (E.D. Va. July 14, 2008) (stating that "[w]here a written
contract is silent on a matter controlled by statute, the statutory requirement becomes an
unwritten term of the contract implied in law")(quoting *Harbour Gate Owners' Ass'n, Inc. v.
Berg*, 348 S.E.2d 252, 257 (Va. 1986)). The Virginia LLC Act provides that "any action
required or permitted to be taken by the members of a limited liability company may be taken
upon a majority vote of the members." Va. Code § 13.1-1022(C). Adding Class B members and
terminating a Member of the JV both fall under "any action" as contemplated in Va. Code §
13.1-1022(C). As defined by the Act, "majority vote . . . consist[s] of the vote or other approval
of members having a majority share of the voting power of all members." Va. Code § 13.1-
1022(B). This means that upon a majority share approval or vote, ATG could be terminated.
The Court finds that pursuant to its 67% voting power, ProActive was authorized to terminate

---

[15] The MOU contained a choice-of-law provision mandating that the laws of the Commonwealth
of Virginia apply. PEX 17, §§ 13.0, 24.0.

ATG by majority vote, as set forth by the Virginia LLC Act.[16]  Because ATG materially

breached the MOU first, its action for breach of contract against ProActive must fail.

In its proposed findings of facts and conclusions of law, Plaintiff cites *Hanover Ins. Co.*

*v. Dunbar Mech. Contractors, LLC*, for the proposition that potential noncompliance with the

51% Rule is not grounds for terminating ATG from the JV.  Dkt. 479 at 26–27 (citing 964 F.3d

763, 766 (8th Cir. 2020)).  ATG's reliance on *Hanover* is misplaced.  In *Hanover*, the defendant,

a contracting company, was awarded a project by the Army Corps of Engineers.  964 F.3d at

764.  While the project was ongoing, the plaintiff, an insurance company, discovered that the

defendant was violating federal regulation by subcontracting more than 85% of its work to a

non-qualifying entity under its Army Corps of Engineers contract.  *Id.* at 766.  The plaintiff

sought a declaratory judgment that it had no obligations to the defendant under a subcontract

performance and payment bond and sought recission of the bond based on the defendant's illegal

subcontract.  *Id.*  The district court determined that because the defendant's subcontract

"undisputedly violated federal law" the illegal subcontract provided grounds for rescission and,

thus, granted the plaintiff's summary judgment motion.  *Id.*  The Eighth Circuit reversed, holding

that the district court could not conclusively determine whether the defendant performed the

requisite percentage of work until the project was completed.  *Id.* at 767.

---

[16] ATG was aware that the 67/33 split could result in its expulsion from the JV.  For example, in
an email, Mr. Newbold explicitly referenced that with the 67/33 split, ProActive could
completely cut ATG out of the JV, and voiced his acquiescence to that fact.  *See* DEX 5 (Mr.
Newbold writing that "[ProActive would] basically have control to cut us out or do whatever you
wish.  I'm actually okay with that"); *see also C.F. Tr., Inc. v. Tyler*, 318 B.R. 795, 805 (E.D. Va.
2004) (noting that "where a writing reflecting an agreement is infected with a genuine ambiguity,
parol evidence of prior or contemporaneous agreements or negotiations may be received as an
aid to determining the parties' intent as to the contractual language at issue").

The facts of the present case are very different. Unlike the district court in *Hanover*, this Court does not conclude that ProActive had a right to terminate ATG from the JV because RTS was not in compliance with the 51% Rule. Rather, this Court concludes that ATG materially breached the MOU first by trying to negotiate the Operating Agreement in direct contravention of the MOU and frustrating the JV's stated purpose by unreasonably delaying execution of the Operating Agreement and in hindering the addition of Class B members. Due to ATG's material breach, ProActive was empowered as the majority Member to terminate ATG from the JV under the terms of the MOU and via the process set forth in the Virginia LLC Act.

For the foregoing reasons, the Court finds in favor of ProActive, and finds that it is not liable for breach of contract.

The Court hereby ORDERS that judgment be entered in favor of Defendant.


August 29, 2022
Alexandria, Virginia

Patricia Tolliver Giles
United States District Judge

31